C. GERARD DODGE, Respondent, *v.* FREDERICK W. RICHMOND, Appellant.

First Department, February 16, 1960.

6

*William J. Butler* of counsel (*Butler, Jablow & Geller,* attorneys), for appellant.

*Lloyd I. Isler* of counsel (*John B. Loughran* with him on the brief; *Loughran, Walsh, Condello & Isler,* attorneys), for respondent.

BREITEL, J.   Plaintiff Dodge, a broker in the investment banking business, recovered a verdict for $147,866.20 as commissions under an alleged agreement in the sale of the assets of a steel company.   The total judgment is $190,268.08.   Defendant Richmond, a promoter in the purchase and sale of corporate enterprises, was, as the purchaser, held liable for the commissions and appeals from the verdict and judgment.

The principal issue in the case is one of fact, namely, whether when the sale closed there was a subsisting agreement for commissions.   Plaintiff Dodge claimed there was, while defendant Richmond contended there was not.   There were also incidental issues turning on the legality of the alleged commission agreement.

The significant conclusion surviving analysis is that the verdict of the jury is against the weight of the credible evidence. This requires the ordering of a new trial, and for that reason it will be necessary, in addition to discussing the evidence in the case, to consider some of the issues of law raised.

Dodge, besides his regular occupation, was a director of the Follansbee Steel Corporation, and from which he also received an annual retainer of $6,000 as a financial consultant.   Prior to

the incidents concerning the steel company Dodge had handled other promotions for Richmond. In the Fall of 1953, Dodge on behalf of Richmond undertook to negotiate the purchase of all the company's assets. By letters dated October 21 and 23, 1953, Richmond agreed to pay Dodge a commission based on the purchase price if the sale were effected. Richmond himself was also acting for others, principally one Berner, but all of Dodge's dealings were with Richmond directly.

In due time, on February 11, 1954, Dodge presented to the board of directors of the steel company Richmond's offer to purchase its assets for a price equal to $21 per share of the outstanding common stock of the corporation. In presenting the offer Dodge advised the board that he had an interest in the matter, and withdrew from its deliberations. The board considered the offer in the absence of Dodge, and rejected it.

Dodge and Richmond, however, continued their conversations. Eventually Dodge suggested making contact with Bache & Co., particularly with a Mr. Bateson in that investment firm, for the purpose of injecting heavier financial elements into the transaction. In the Spring of 1954 they met and, after a number of conferences, Bateson came up with a solution. That solution was to bring in the Murchison interests of Texas who would be interested in merging two of their corporations with the steel company after the sale of its assets to Richmond. The advantages to the Murchison interests would be the gain of a listed status on the New York Stock Exchange and the income tax benefit of a loss-carryover. For this they would be prepared to pay a price.

There followed intensive negotiations. A proposal for the double-phase transaction resulted. Richmond would buy the assets at a price equal to $20 per common share of the steel company. Murchison would merge its two corporations into the surviving steel company which would retain the proceeds from the sale of the assets to Richmond. The stockholders of the steel company would receive both common and preferred stock in the surviving corporation deemed to have a value equivalent to $25 per share of the old stock.

The tandem proposal was also presented by Dodge to the board of the steel company, at the invitation of the president of the corporation, who had been advised of its nature. This time Dodge did not withdraw from the meeting but, in fact, participated in that and in subsequent meetings during which the proposal was progressed. Indeed, it was Dodge who made the motion at the board meeting on September 13, 1954, by which the jointly presented Richmond-Murchison proposal was

approved, and the board thereupon agreed to recommend it to a special meeting of the stockholders. Despite the fact that the proposal had been substantially altered in form, it is not clear that Dodge ever advised the board that he still had an interest in any part of the deal. It is undisputed that he never disclosed the particulars of such interest.

In connection with the stockholders' meeting statements soliciting proxies from the stockholders were issued, signed by all of the directors, including Dodge. The proxy statements contained the usual representation that none of the officers or directors had any interest, direct or indirect, in the corporation to be formed by Richmond which would take over the assets purchased from the steel company. Nothing was said about any commission or brokerage to which Dodge might be entitled.

The stockholders approved the proposal at an adjourned meeting on November 1, 1954. Everything was now set for its completion, in both phases, at the end of the year.

All during this time, according to Dodge, he was entitled, under his letter agreement with Richmond, to commissions based upon the price in the event the assets of the steel company were purchased by Richmond.

Richmond has contended in this action, however, that this letter agreement related only to the first proposal presented by Dodge to the board of the steel company. He claims that after such offer was rejected and the Bache firm became involved it was agreed that Dodge was to receive no compensation. It was agreed and understood, he says, that without the aid of Bateson, and the Murchison merger proposal, Richmond and Dodge were in no position to effect a purchase. It was agreed and understood, Richmond contends, that only Bache was to receive a commission.

Dodge claims that this was not so and that, moreover, he was the persisting procuring cause of the entire transaction and particularly of the phase in which the assets were purchased. He claims that the Bache people were to receive a commission, but only in connection with bringing about the inclusion of the Murchison interests in the deal. He thus explains the fact that Bache was to, and did, receive a commission.

Richmond answers Dodge's argument by pointing out that Bache was to receive a commission not only from the Murchison people, but also from him. Moreover, this obligation was evidenced by a letter agreement, executed June 11, 1954, under which he was obligated to pay Bache a commission of $200,000 if the assets purchase were effected.

If this were all there were to the facts in the case there would have been but a sharp issue of fact for the jury to resolve, and its resolution of that issue probably could not be disturbed. However, more was to happen before the sale and merger of the steel company was to be completed. The later happenings certainly affected the possible interpretation of the preceding events, if they did not actually alter their structure and effect.

Some time after the stockholders' meeting, the Federal Securities and Exchange Commission (S. E. C.) became interested. It investigated possible violations by the steel company of the controlling statute (Securities and Exchange Act, § 14; U. S. Code, tit. 15, § 78n) and the proxy rules and regulations adopted thereunder (Rule X-14A-3; Code of Fed. Reg., tit. 17, § 240.14a-3). The target of the investigation was the suspected failure to make complete disclosure of officer. and director interests in the proxy statement sent to the steel company stockholders.

In that investigation Dodge and Richmond were questioned in private hearings. This was on December 2, 1954. Both men, separately, testified that Dodge was not entitled to any commission or compensation of any kind with respect to the sale of the assets or the merger of the steel company. It was unequivocally represented that Dodge had no present interest in the transaction. He testified flatly that his original agreement with Richmond with reference to the Follansbee deal had been " abrogated ". He explained that he did this, that is, " abrogated " the agreement, because his fellow directors suggested that there was a conflict with his fiduciary position. He was explicit that his arrangements with Richmond continued as to promotions, other than the steel company, to which his letter agreement with Richmond makes reference.

The testimony of both men before the S. E. C. was received in evidence, generally, upon the trial. Dodge, on the trial, testified that his S. E. C. testimony was true and that there was no inconsistency between it and his present testimony. In attempting to reconcile the two, he claimed that all of the references before the S. E. C. related exclusively to the Murchison phase of the transaction in which, of course, he was entitled to no compensation.

Four days after the S. E. C. testimony Richmond executed a new letter agreement with Bache under which it was agreed that Richmond was to pay only $100,000, instead of $200,000, as a commission to Bache, if the sale of the assets of the steel company were consummated.

The letter agreement purports to confirm a telephone discussion on December 3, the day after the testimony before the S. E. C. It recites that the change is " [i]n consideration of my [Richmond] proceeding with the transaction under *altered* circumstances " (emphasis supplied). On the trial no reason or circumstances were supplied for this voluntary modification by Bache on the eve of the closing of the transaction.

On December 23, 1954, the Richmond-Murchison transaction with the steel company closed. In due time, Richmond, or the corporation he caused to be organized to take over the steel company assets, paid the reduced commission owed Bache in two installments. According to Dodge, on February 1, 1955, he asked Richmond for a commission. Under date of February 16, 1955, he repeated his demand. He was put off.

Dodge also went to Bache. Under date of February 3, 1955, he asked them for a share of their commission, on the theory, he says, that after all, without his help, they would not have earned their commission. On the trial he disclaimed any legal right to such commission from Bache, saying that he had been seeking only a " moral " adjustment. Bateson, of Bache, however, says that Dodge made it quite clear that he was demanding a commission from Bache as a matter of right.

In the meantime, Dodge persisted in his pursuit of a commission from Richmond. In the course of conversations, in the Spring of 1955, between Dodge, Richmond, and Richmond's lawyer, there was talk of $100,000 being due to Dodge. At least so Dodge says. No one explains where this even figure comes from, except that it coincides with the amount by which the Bache commission had been reduced one to four days after Dodge and Richmond testified before the S. E. C. In April, 1956, Richmond took up the demand with his associate or principal, Berner, who flatly declined to pay any money to Dodge.

Dodge, failing in his efforts to obtain money from either Richmond, Richmond's principal, or Bache, brought this action, claiming a commission from Richmond under the letter agreement of October 21, 1953, as modified by a further letter of Richmond's dated March 17, 1954. The action was begun in September, 1957, almost three years after the S. E. C.'s investigation and the completion of the transaction.

Richmond argued, upon the trial and in this court, that Dodge's testimony before the S. E. C. requires determination as a matter of law that he had no contractual right to recover commissions. This contention cannot be sustained. The S. E. C.

testimony, no matter how strong, amounts to no more than a prior admission against interest by Dodge. In the absence of other circumstances, not presented here, the S. E. C. testimony did not give rise to an estoppel. Hence, whether, in truth, Dodge had a contractual right against Richmond would still be for the fact finder to determine (*Gangi* v. *Fradus*, 227 N. Y. 452, 456–457; *Talbot* v. *Laubheim*, 188 N. Y. 421, 424–425; Richardson, Evidence [8th ed.], §§ 295, 307; 31 C. J. S., Evidence, §§ 380–382). In making such determination great weight should be given to admissions consisting of recorded testimony before a Federal agency. But were it eventually concluded that Dodge had testified falsely before the S. E. C. and was now telling the truth, to that extent there would still be a finding of a subsisting agreement for the payment of commissions.

That the S. E. C. testimony is not dispositive of the issue as a matter of law is not sufficient, however, to protect the verdict in this case. It may nevertheless be that the S. E. C. testimony has such weight, and its content in relation to the surrounding circumstances has such significance, that the verdict is palpably against the weight of the credible evidence.

Dodge argues that his testimony before the S. E. C. must be read in its entirety. Reading the testimony as a whole only confirms the impression gained from the extracts relied on by Richmond and makes patent that Dodge's bold attempt at reconstruction of his S. E. C. testimony is insupportable and false.*

---

\* A fair combination extract reads as follows:

"Q. Before we get to the actual meeting itself, Mr. Dodge, in all of these negotiations that you were carrying on with the Follansbee people, on behalf of Mr. Richmond, had you an agreement or understanding with Mr. Richmond regarding your fee or remuneration?

"A. I had a written agreement with Mr. Richmond about all deals that I brought to him and completed.

"Q. Can you tell us the substance of that agreement?

"A. Yes. The substance was that if I completed a deal for him I was to get 5 percent on the first million, 2 percent on the second million, and one percent on everything in excess of that.

"Q. And that is a continuing agreement?

"A. That was an agreement that he agreed upon in substance.
"  *  *  *

"Q. That agreement has not been abrogated as of this time, has it?

"A. It has as far as the Follansbee deal is concerned, yes.

"Q. You mean it has been formally abrogated?

"A. It is abrogated by the fact that I no longer — I have no agreement with him whatsoever in the Follansbee deal.
"  *  *  *

Beyond the point of raising an issue of fact, the S. E. C. testimony contains the assertion by Dodge, repeated many times, that he has no financial interest whatsoever in the Richmond-Murchison transaction.    Moreover, the inquiry centered about the proxy statements which, perforce, embraced both phases of the proposed acquisition.   Indeed, Dodge testified unequivocally that he expected no fee from Richmond and that his agreement with Richmond had been abrogated.    Such testimony was and could only be addressed to the Richmond phase of the deal. Separately, he answered that he expected no fee or commission from Bache.    This being true, Dodge either testified falsely

" Q. Well, at least in connection with your negotiation with Mr. Richmond on this deal early this year, that agreement was still in effect?

" A. That is correct.

" * * * *

" Q. Do you have any understanding whether express or implied, whether written or oral, that upon the consummation of any arrangement with Mr. Richmond or anyone on his behalf that you would receive a fee?

" A. No, sir.

" Q. Do you have any arrangements with any other person who may receive a fee from Mr. Richmond or from anyone on his behalf?

" A. No, sir.   I signed an affidavit on the Bache situation.

" * * * *

" Q. Did I understand you to say, Mr. Dodge, specifically, that you will not receive any fee whatsoever from Bache and Company?

" A. Correct.

" Q. From Phillip Bateson?

" A. I signed an affidavit on that.

" Q. From Phillip Bateson?

" A. Phillip Bateson — that is correct.

" Q. Or from Richmond?

" A. Or from Richmond.

" Q. And you have no expectation of receiving a fee?

" A. No, sir.

" Q. You don't intend to request a fee?

" A. No, sir."

By Mr. Woodside:

" Q. Did you at that time have expectation of receiving a fee?

" A. In the first instance, definitely yes.

" Q. At the time the letter was submitted in January, did you have such expectation?

" A. Yes, sir.

" Q. What occurred to change that?

" A. Simply that the directors thought, and so expressed themselves to me, that I shouldn't be compensated for anything of that character, and I looked at it their way and decided that that was correct, that I was acting in a fiduciary capacity, and I therefore shouldn't get involved in such a situation.

" Q. When was that discussed with the directors?

" * * * *

" A. Prior to the June deal, yes, sir — way prior to the June deal."

before the S. E. C. or upon the trial in this action. Indeed, if proper request had been made, the court would have been required to charge that if the jury believed Dodge's testimony before the S. E. C., then it must return a verdict for defendant (cf. *Schultz* v. *Greenwood Cemetery,* 190 N. Y. 276, 282). On this ground alone, even in the absence of a proper request, in the interests of justice and its public administration, a new trial is merited (*Molnar* v. *Slattery Contr. Co.,* 8 A D 2d 95, 100).

If there were no more to the case than a conflict in testimony given on different occasions there might have been, in this civil action, a relatively simple issue before the jury, provided the conflict had not been falsely masked. But the circumstances surrounding the conflicting testimony compel profounder analysis.

Richmond testified before the S. E. C. to the same effect as did Dodge. And, as noted, they testified separately. Richmond says, and it is very likely, that the two consulted in advance of testifying before the S. E. C. and agreed that each would, in conformance with the other, tell the " truth ". The " truth " was, they agreed, says Richmond, that Dodge was to receive no commission in the Richmond-Murchison transaction. Richmond, at the trial, had difficulty in justifying the necessity for the two men to get together to tell the truth. But that may be simply another significant tell-tale circumstance.

Four days after the testimony before the S. E. C., as earlier observed, Richmond confirmed, in writing, a new deal with Bache whereby the commission he was to pay them was reduced from $200,000 to $100,000. As noted too, the reason for this voluntary reduction made on the eve of the closing of the transaction was never explained on the trial. The reduction in the Bache commission becomes suggestive, albeit inconclusively, in the light of later references to a sum of $100,000 flat being due from Richmond to Dodge, rather than the larger, uneven amount purportedly due Dodge under his old letter agreement.

The events immediately preceding and immediately following the S. E. C. testimony provide a key. On the weight of the credible evidence, whatever occurred does not fit the claim or the trial testimony of Dodge. If one credits the S. E. C. testimony, Dodge had truly " abrogated " (the word he used before the S. E. C.) the old commission arrangement he had with Richmond. In that event Richmond's version is correct and he was entitled to a verdict. If one discredits the S. E. C. testimony, and also assesses the surrounding and shortly ensuing circumstances, the parties, faced with the threat of the S. E. C. investigation and destruction of the transaction, made a new deal.

Thereby there was effected a switch of commissions on either a binding basis or a "gentleman's understanding" among Dodge, Richmond, and possibly Bache. On no view may the S. E. C. testimony or the general setting in which it occurred be ignored.

On the analysis last discussed, plaintiff Dodge has not proved his case, credibly, according to his pleadings or his trial testimony. While Dodge's trial story is not believable, one cannot say so as a matter of law. As a consequence his complaint may not be dismissed. The verdict, however, is against the weight of the credible evidence and should be set aside.

Because a new trial is required, some of the legal issues raised by Richmond on the appeal merit discussion.

Richmond pleaded as an affirmative defense that the agreement with Dodge, if there were one, was illegal, because it involved a breach of the fiduciary obligation owed by Dodge to the steel company in which he was a director. This defense was dismissed on the trial and was never submitted to the jury. On the record the dismissal of the pleaded defense of illegality was proper.

It appears to be the rule, in this State at least, that an agreement which is lawful on its face and which does not contemplate or necessarily entail unlawful conduct in its performance is enforcible by the promisee even though he engages in unlawful activity in the agreement's performance. (*McConnell* v. *Commonwealth Pictures Corp.*, 1 Misc 2d 751, affd. 7 A D 2d 905*; *Dunham* v. *Hastings Pavement Co.*, 56 App. Div. 244, motion for rearg. denied with opinion, 57 App. Div. 426; *Russell* v. *Burton*, 66 Barb. 539; *St. John Shipping Corp.* v. *Joseph Rank, Ltd.*, [1957] 1 Q. B. 267, [1956] 3 Weekly L. R. 870; Greenhood, Public Policy in the Law of Contracts, p. 27, rule XXX; cf. *Merchants' Line* v. *Baltimore & Ohio R. R. Co.*, 222 N. Y. 344; *Deeds* v. *Gilmer*, 162 Va. 157, 250; 19 C. J. S., Corporations, § 787; contra: *Tocci* v. *Lembo*, 325 Mass. 707; 6 Williston, Contracts [Rev. ed.], § 1761.) Even knowledge on the part of the seller that the buyer intends to use the property unlawfully is not necessarily a good defense to an action for the price (*Tracy* v. *Talmage,* 14 N. Y. 162; Restatement, Contracts, § 602).

The cases urged by Richmond to the contrary do not so hold. (*Wood* v. *Manchester Fire Assur. Co.*, 30 Misc. 330, affd. 54 App. Div. 522; *Rush* v. *Curtiss-Wright Export Corp.*, 263 App. Div. 69, affd. 289 N. Y. 562; *Greenfield* v. *Bausch*, 238 App. Div. 52.)

---

* Appeal argued in the Court of Appeals, Jan. 20, 1960.

The *Wood* and *Rush* cases (*supra*) involved situations where the contract at inception was tainted with corruption and could not have been performed without a breach of a fiduciary obligation. This was not the case as to the original agreement between Dodge and Richmond; for that agreement could have been performed lawfully if there were sufficient disclosure to the directors, the stockholders, and the S. E. C.

The *Greenfield* case (*supra*) comes closer to the mark. There, a real estate broker, who had received a commission from the seller, was denied recovery of a commission from the buyer. The commission to be paid by the buyer to the seller's broker under their agreement was based upon the ability of the broker to persuade the seller to lower his price. This court sustained the buyer's defense of illegality on the familiar principle that the seller was entitled to the broker's undivided allegiance and upon a finding that the broker had concealed his agreement with the buyer from the seller.

A superficial analogy to the setting in this case is readily apparent. Richmond urges in support of the pleaded illegality defense that the steel company was also entitled to Dodge's undivided allegiance and that he also effectively concealed from the company his agreement with Richmond under the joint proposal eventually developed. Thus, it is urged that neither in this case nor in the *Greenfield* case was the agreement itself corrupt at inception and that in both cases the wrongful conduct (namely, the failure to make disclosure) occurred in the agreement's performance.

The *Greenfield* holding is understood on the practical ground that in the typical real estate transaction the seller retains and expects his broker to negotiate the highest price. The relation is created solely for that purpose. Under such circumstances, the mere making of a commission agreement between the broker and purchaser in the *Greenfield* case, without the knowledge and prior approval of the seller, is *ipso facto* corrupt (cf. Restatement, Agency 2d, §§ 387, 389, 391, 392, esp. Illus. 2, 394).

A corporate director, however, does not necessarily sustain an exclusive relation with his corporation. Certainly, he is not chosen thus, as was the broker in the *Greenfield* case, with respect to the very contract which involves conflicting interests. It is not uncommon for a director to inactivate himself temporarily in order to represent his own interest, or even the conflicting interest of another, in dealing with the corporation of which he is a director. Particularly as to corporations whose stock is publicly held, board members are often placed in a position where their loyalty is divided. A conflict of interest may

even be thrust upon them. The qualifiedly accepted and normal procedure, of course, is immediate and full disclosure, together with complete withdrawal from participation in the deliberations of the board (see, e.g., *Everett* v. *Phillips,* 288 N. Y. 227; 3 Fletcher's Cyclopedia Corporations [Perm. ed.], § 929 *et seq.*).

Thus, here, there was nothing *prima facie* legally wrong in Dodge's undertaking to act on Richmond's behalf. Moreover, the certificate of incorporation of the steel company provided that a director might be interested in any transaction of the corporation without rendering it voidable, provided sufficient disclosure was made. Hence, Richmond might properly assume that Dodge would make complete disclosure of his interest to the board. The other members of the board would presumably then be in a position to protect the interests of the company. Any failure by Dodge to make proper disclosure would constitute subsequent illegality or misconduct which, on principles already discussed, would not vitiate the contract valid at inception.

Upon a new trial an issue of illegality may, nevertheless, arise. If a fact finder should conclude that Dodge and Richmond made a new deal in December, 1954, to rearrange and yet save the payment of commission in order to carry forward the deception of the S. E. C., then such an agreement, newly made, with corruption and fraud contemplated as its purpose, would be illegal and unenforcible. The law is well settled that an agreement made at the inception for an illegal purpose and so contemplated by both parties may not stand (*Stone* v. *Freeman,* 298 N. Y. 268; *Miltenberg & Samton* v. *Mallor,* 1 A D 2d 458; Restatement, Contracts, *supra,* §§ 512, 548, 554).

Thus, if it should appear upon the new trial, to the satisfaction of the fact finder, that the parties were involved in a substituted agreement in December, 1954, which implemented the fraud and false testimony before the S. E. C. and was designed to bring that fraud to a successful consummation, neither may recover from the other for any benefits claimed. In a proper case, such illegality may bar recovery even though the defense has not been pleaded (*Attridge* v. *Pembroke,* 235 App. Div. 101, 102–103; *Dunham* v. *Hastings Pavement Co.,* 56 App. Div. 244, 247–248, *supra*; cf. *Brearton* v. *De Witt,* 252 N. Y. 495, 500).

Richmond has also raised an issue, assuming Dodge is entitled to recover a commission, as to the base price upon which the commission is to be computed. The original commission agreement provided for a commission of 5% on the first million

dollars of the price, 2½% on the second, and 1% on the excess. In the documents literally, from the initial Richmond offer until the final Richmond contract, the price is always referred to nominally as a gross sum less certain liquid and current assets. The difference is a large one. The gross assets were worth $9,286,620. The liquid and current assets aggregated just under $6 million.

Richmond says that the commission should be computed on the net difference, which is something over $3 million. He argues with some cogency that, realistically viewed, the sale was not of all the assets, and that the price fixed explicitly provided for the deduction. Dodge contends, on the other hand, that the reason for the price adjustment was merely to avoid an unnecessary shuttling and reshuttling of the specified liquid assets between the steel company and Richmond. He argues that the purchase price was the gross figure computed on the basis of $20 per share for each outstanding share of the steel company.

The question, of course, ultimately, is one of the intention of the parties to the commission agreement as manifested in their writings. And that issue could depend, in part, on the intention, as manifested, of the seller and purchaser, namely, what they intended to sell — the gross or the net assets. The language of the documents is not entirely clear. On the present submission the net rather than the gross price is arguably controlling, but the ambiguity need not be resolved on this appeal because, on a new trial, clarifying proof of custom and practice in transactions of this sort may be available (*B. M. Heede, Inc.* v. *Roberts,* 303 N. Y. 385; Richardson, *op cit.*, § 602).

Accordingly, the judgment in favor of plaintiff should be reversed, on the law and the facts, the verdict vacated, and a new trial ordered, with costs of the appeal to defendant-appellant to abide the event.

BOTEIN, P. J., M. M. FRANK, McNALLY and STEVENS, J., concur.

Judgment unanimously reversed, on the law and on the facts, the verdict vacated, and a new trial ordered, with costs of the appeal to defendant-appellant to abide the event.