RICHLAND DEVELOPMENT COMPANY, Inc. and National Pool Equipment Company, Appellants,

v.

George STAPLES, Jr., Appellee.

No. 17980.

United States Court of Appeals Fifth Circuit.

Oct. 11, 1961.

J. Andy Zenge, Jr., Canton, Mo., Jesse A. Keller, Florence, Ala., for appellants.

Norman W. Harris, Julian Harris, Decatur, Ala., for appellee.

Before RIVES and WISDOM, Circuit Judges, and WRIGHT, District Judge.

WISDOM, Circuit Judge.

This is an action by a real estate agent against two Alabama corporations for the recovery of a commission agreed to in a valid Missouri brokerage contract covering the sale of the defendants' land in Alabama. The principal defense is that the broker, a licensed real estate agent in Missouri, performed certain acts in Alabama related to the sale of the land in Alabama without having been licensed locally as a real estate agent. We affirm the district court's decision in favor of the Missouri broker.

In 1958 George Staples, Jr., the plaintiff-appellee, was a licensed real estate broker in Charleston, Missouri. He had never had an Alabama broker's license, had no office in Alabama, and had never had anything to do with any real estate transaction in Alabama other than the one that produced this litigation. E. L. Culver was president of Richland Development Corporation and National Pool Equipment Company, the defendants, Alabama corporations having their place of business in Florence, Alabama.

Early in 1958 Staples traveled to Florence for the purpose of negotiating with Culver for a distributorship of National Pool's products in Missouri, a matter entirely dissociated from Staple's real estate business. During the negotiations Culver, learning that Staples was a real estate agent in Missouri, told Staples that he would like to obtain a loan of $400,000, for which he would pay a commission of five per cent. Staples was unable to obtain the loan. There were further discussions in Cairo, Illinois, in February 1958, in the course of which Staples suggested to Culver that the funds be raised by selling the land to an investor under a lease back arrangement for use of the land as a site for a manufacturing plant. Staples also discussed several other business ideas with Culver and together they made a number of trips investigating the possibility of extending National Pool's operations into the manufacture of an agricultural grain dryer. September 4 on a trip in Culver's plane from Cairo, Illinois, to Kansas City, Missouri,

while over Missouri, Culver employed Staples to sell the land for $420,000 with a commission to Staples of $20,000. At this time Staples discussed with Culver the possibility of selling the property to Noel Smith, a Missourian, with a lease back for twenty years. On this same trip Staples told Dale Alcorn, another Missouri real estate broker, that he would pay Alcorn $5,000 for his help in consummating the sale of the property to Smith. On September 11 Staples met Smith in Jefferson City, Missouri, and drove with him to Sikeston, Missouri. During the ride Staples succeeded in interesting Smith in making the purchase. Staples then arranged to have Culver send his plane to Missouri for Smith and Alcorn to inspect the property in Florence. Smith made the trip without Staples, who had other business in Memphis. On his return, Smith met with Staples September 13 at Charleston, Missouri. Smith said that he would buy a half interest in the land, and that he would try to persuade his partner, Ben Ginter, to buy the other half. The next day Smith went to Staple's home, and the two talked at length about the property. That night Smith called Staples from Fairfield, Illinois to say that he had talked with Ginter, who was in Canada, and that Ginter agreed to join in the purchase, subject to his seeing the property. On September 18 Staples and an accountant from Memphis discussed with officials of one of the banks in St. Louis arrangements for a mortgage loan from the bank to Smith and Ginter of $250,000. at Smith's request Staples arranged with Culver to have the latter send his plane to Charleston for Smith who wished to work out the details personally with Culver.

September 22 Staples, Smith, and Alcorn flew to Florence and reached an agreement with Culver on the terms of the sale. The price was $420,000, to be paid in cash, with a lease back for twenty years subject to certain options. This agreement was subject to Ginter's approval after seeing the property. Later that week Staples, Smith, and Ginter drove to Memphis, Tennessee, to discuss the transaction with the accountant there, and at that time Smith disclosed that there was a large federal tax lien outstanding against him. The accountant suggested that a mortgage loan be arranged, indorsed by Culver and National, and sold to the bank financing the transaction. Culver agreed to pay Staples $10,000 of his commission out of the down payment and to give him a note, payable in four months, for the remaining $10,000. The following day, in Florence, the parties agreed that a mortgage would be issued to Richland Development Company for $250,000 and, after indorsement by Culver, would be sold by Staples to raise that portion of the purchase price, with the remainder, $170,000, to be paid in cash by Smith and Ginter. The parties stayed in Florence until September 30 while the details of the transaction were worked out. Smith's lawyer drew a draft of the agreement and all parties, expressing satisfaction with the draft, shook hands on the deal. Since the agreement called for the immediate payment of $170,000 and Culver was unwilling to accept a check drawn by Ginter on a Canadian bank, Staples went to Canton, Mississippi, to obtain a cashier's check for Ginter to give to defendants. Staples returned to Florence October 4 with a cashier's check and with the contract signed by Smith, individually and as vice-president of Midwest Construction Ltd. A disagreement developed between Staples and Culver on the payment of the commission and on the mortgage feature of the land transaction. Staples went back to Missouri and obtained an agreement from Smith that he would pay the entire purchase price in cash if the mortgage could not be sold.

October 20 Smith and Alcorn, who had become active after October 6, went to Florence, and there Smith's lawyer drew up a second agreement. This, like the first, was in the form of an option and in other details was in substantial conformity with the first agreement. This agreement was executed that day. The

option was exercised and the sellers conveyed the property by deed to the buyers December 17, 1958. By this time there was a dispute between Staples and Alcorn. Culver refused to pay the commission for the sale to Staples. Instead, he paid the $20,000 to Alcorn who executed an indemnity agreement to protect the defendants against any liabilities and cost arising from Staples's conflicting claim to the commission.

Staples sued in the federal district court for the Northern District of Alabama to recover the commission. The defendants asserted that the plaintiff could not recover because he had not obtained an Alabama license to act as a real estate broker in Alabama and because he had not performed his obligations under the contract. The district judge, trying the case without a jury, rejected both defenses and granted recovery for the plaintiff. The defendants appealed on both counts.

## I.

A real estate brokerage contract is a contract of employment, not a sale or other contract conveying an interest in land. Its validity is governed, therefore, by the law of the place where the agreement is made, rather than by the law of the situs of the land or the law of the forum. We have found no Alabama decision on this choice of law point, but the principle stated is about as well established as most so-called "settled" principles are established.[1] We accept it—in the circumstances of this case.[2] In this

1. "A contract for the sale or lease of land by a real-estate broker is governed by the law of the state of its consummation and its validity is determined by that law, and not by the law of the state where the real estate happens to be situated or by the law of the forum. Hence, if the contract is valid by the lex loci contractus, the broker can recover on it, even though by the law of the forum or the law of the state where the land is situated he may not have secured a license or otherwise have complied with regulatory measures." 11 Am.Jur., Conflict of Laws, § 167, p. 474. "The general rule is that a brokerage contract is a contract of employment for personal services and its validity is determined by the law of the state where made, unless it appears from the contract that it is to be performed elsewhere, in which event the law of the state where it is to be performed governs irrespective of the location of the property involved." James v. Hiller, 1958, 85 Ariz. 40, 330 P.2d 999, 1001. "The contention that the contract was void because of the fact that the plaintiff did not have an Idaho real estate broker's license is also without merit. The jury found that the contract was made in Utah. And though it employed plaintiff to procure a purchaser for lands located in Idaho, the sale did for that reason not have to be consummated in Idaho. Under its terms plaintiff was authorized to sell the land to anyone who was willing to pay the agreed purchase price. Under its terms the contract could have been performed anywhere. See Detroit & Cleveland Nav. Co.

v. Hade, supra, 106 Ohio St. 464, 140 N.E. 180. Being a Utah contract and not by its terms requiring plaintiff to engage in the business of a real estate broker in Idaho, the contract was not invalid because of the fact that the plaintiff had no Idaho broker's license." Johnson v. Allen, 1945, 108 Utah 148, 158 P.2d 134, 139, 159 A.L.R. 256. See also Cochran v. Ellsworth, 1954, 126 Cal.App.2d 429, 272 P.2d 904; Frankel v. Allied Mills, 1938, 369 Ill. 578, 17 N.E.2d 570; Annotation, 1945, 159 A.L.R. 266.

2. Professor Ehrenzweig has stated that "[f]oreign brokers who are not licensed locally, or who are employed by a contract which violates the local Statute of Frauds, will not be permitted to recover commissions for sales of forum land, even though either the contract of employment or the contract of sale was executed or performed in a state whose law would have entitled them to that commission." Ehrenzweig, The Real Estate Broker and the Conflict of Laws, 59 Colum.L.Rev. 303, 306 (1959). He states that this practice of the courts is in conflict with the "official" theory and that recognition of it would obviate the need for a belabored resort to local law of the "remedy" or public policy. There is a dearth of case law to support these observations, however, and the cases Professor Ehrenzweig cites are distinguishable from the instant case. (1) In Harris v. Kent House Corp., D.C.D. Conn.1954, 127 F.Supp. 44, the court found that the contract called for performance of acts in Connecticut which would be illegal and stated its doubts

case equity and common sense go hand in hand with doctrine. Not only the making of the contract but the center of gravity of the significant acts of the parties touching the performance of the employment contract is in Missouri.[3]

■■ It is undisputed that if tested by Missouri law the contract is valid and binding. The appellant contends, however, that even though the contract may be valid and enforceable elsewhere,

Staples cannot enforce it in Alabama since to do so would contravene Alabama public policy as embodied in its Real Estate License Law. It is undeniable that a state may refuse to enforce a contract valid in the state where made, if the contract conflicts with the public policy of the state.[4] The application of this doctrine, however, is limited to cases where strong reasons of public policy support it.[5] Of course, a state has a certain lati-

that the contract would be enforceable anywhere. (2) Tanenbaum v. Sylvan Builders, Inc., (App.Div.1958) 50 N.J. Super. 342, 142 A.2d 247, affirmed (N.J. 1959) 29 N.J. 63, 148 A.2d 176; and Minot v. Hoyt Bros., 1958, 53 N.J.Super. 332, 147 A.2d 92 are both New Jersey cases, and the Minot case was decided in direct reliance on the Tanenbaum decision. The court there relied heavily on the New Jersey statute closing the courts of the state to suits by an unlicensed broker for enforcement of a contract when its formation or performance had violated its laws. The statute in Tanenbaum provided: "No person * * * shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he was a duly licensed real estate broker at the time the alleged cause of action arose." [50 N.J.Super. 342, 142 A.2d 253.] The Tanenbaum opinion stated that a "single act" would bar recovery under the New Jersey statute, in contrast to our holding. (3) Reed v. Kelly, 7 Cir., 1949, 177 F.2d 473, and Arnold v. Wilson, D.C.S.D.Tex.1952, 107 F.Supp. 961, cited as cases in which the court made a belabored resort to "remedy", were both based on a specific state statute similar to the one in Tanenbaum denying enforcement where contracts failed to conform with the requirements of the statutes. Such a statute closing the doors of the courts appears to be a directive which the courts quite clearly should follow irrespective of whether the contract would otherwise be enforceable under conflicts of laws principles. These cases therefore are of doubtful relevance where a contract or its performance has infringed a local licensing or other regulatory statute but there is no special provision closing the courts. In Ehrenzweig's "Contracts in the Conflicts of Laws", 59 Col. 973 (1959), he points out that "invalidation has oc-

curred only exceptionally"; that "even in [the] area [of contracts violating licensing provisions] the trend toward validation can be observed." 59 Col. 973, 1003.

3. See Barber Co. v. Hughes, 1945, 223 Ind. 570, 63 N.E.2d 417; Leflar, Conflict of Laws § 125 (1959).

4. The Kensington, 1902, 183 U.S. 263, 22 S.Ct. 102, 46 L.Ed. 190; Griffin v. McCoach, 1941, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481, 134 A.L.R. 1462; see Note, The Public Policy Concept in the Conflict of Laws, 33 Colum.L.Rev. 508 (1933).

5. The restrictive nature of the doctrine is reflected by the Supreme Court statement, "a state 'will not lend the aid of its courts to enforce a contract founded upon a foreign law where to do so would be repugnant to good morals, would lead to disturbance and disorganization of the local municipal law, or, in other words, violate the public policy of the state where the enforcement of the foreign contract is sought.' Bond v. Hume, 243 U.S. 15, 21, 37 S.Ct. 366, 368, 61 L. Ed. 565. Applying that reasoning this Court affirmed the federal court in following Texas' decisions which refused to enforce a valid foreign contract of guarantyship against a married woman. Union Trust Co. v. Grosman, 245 U.S. 412, 38 S.Ct. 147, 62 L.Ed. 368. Likewise state courts have been upheld in refusing to lend their aid to enforce foreign contracts which required the doing of prohibited acts within the state of the forum. Bothwell v. Buckbee-Mears Company, 275 U.S. 274, 278, 48 S.Ct. 124, 125, 72 L.Ed. 277." Griffin v. McCoach, supra note 4, 313 U.S. at page 506, 61 S.Ct. at page 1027. In Ex parte Rice, 1952, 258 Ala. 132, 61 So.2d 7, 10, 11, the Supreme Court of Alabama stated: "[S]pecific performance of the contract will not be refused on such a claim [conflict with public policy] unless it directly tends to injure the public or is detrimental to

tude in declaring what foreign contracts violate its public policy, but if the asserted policy is nothing more than the fact that the forum state has prescribed a different law to govern a particular transaction, the foreign law will usually be enforced.[6] In any event we sit as an Alabama court. Under Erie, if the courts of a state would close their doors to the enforcement of a contract contrary to the state's public policy, a federal court sitting in that state must follow suit.[7]

The Alabama Real Estate License Law, Code of Ala., Tit. 46, § 311, in relevant part, provides:

"(2) License required.—It shall be unlawful for any person to engage in the business, occupation, or calling of a real estate broker or real estate salesman without a license as provided herein.

"(3) Definitions; to whom chapter does not apply.—(a) As used in this chapter, unless the context requires a different meaning, 'person[s]' includes partnerships, associations, firms, and corporations; 'real estate broker' includes any person who, for a fee, commission, or other valuable consideration, or who with the intention or expectation of receiving or collecting a fee, or commission, or other valuable consideration, lists, sells, purchases, exchanges, rents, leases, options, or auctions real estate or the improvements thereon, or negotiates or attempts to negotiate any real estate transaction, or advertises or holds himself out as

engaged in the real estate business * * *."

We take notice that a recent decision of the Alabama Supreme Court interprets the statute as applicable to a single isolated transaction. Bickley v. San Antwerp Realty Co., 1960, 271 Ala. 117, 122 So.2d 275. We assume then that Staples's acts in Alabama, without the blessings of the Alabama Real Estate Board, constituted a violation of the act.

Despite the superficial resemblance, the instant case is *not* controlled by Knight v. Watson, 1930, 221 Ala. 69, 12 So. 841, 842, holding that the plaintiff's failure to comply with the license requirement barred recovery on his brokerage contract. In that case the broker was an Alabama resident and the contract was made in Alabama. The non-compliance with the Alabama license laws made the contract illegal and void under any law; the place of making of the contract, the situs, and the place where the significant acts were performed coincided with the law of the forum. The contract in Knight v. Watson, unlike the contract in this case, would have been unenforceable in any other state as well as in Alabama. This difference also distinguishes the case at bar from Moore v. Burdine, La.App.1937, 174 So. 279.

We observe too that the case at bar differs from the usual case when the public policy of the forum state is invoked as a basis for denying enforcement of a contract. Generally the conflict with the state's policy is inherent in the nature of the contract;[8] here it arose only during

---

the public. Bankers & Shippers Ins. Co. v. Blackwell, 255 Ala. 360(15), 368, 51 So.2d 498. The principle that contracts contravening public policy are unenforceable should be applied cautiously and only in cases plainly within the reason for it."

6. Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 1934, 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178, 92 A.L.R. 928; Sun Insurance Office Limited v. Clay, 5 Cir., 1959, 265 F.2d 522.

7. Griffin v. McCoach supra note 4; Angel v. Bullington, 1947, 330 U.S. 183, 67 S. Ct. 657, 91 L.Ed. 832.

8. For example, in Lobek v. Gross, 1949, 2 N.J. 100, 65 A.2d 744, the New Jersey court refused to enforce a contract valid in Illinois, where it was made, on the ground that the contract constituted a restraint on marriage. Similarly, in Lynch v. Bailey, 1949, 275 App.Div. 527, 90 N.Y.S.2d 359, affirmed 300 N.Y. 615, 90 N.E.2d 484, the New York courts denied enforcement of an agreement found to be in restraint of trade.

In Henning v. Hill, 1923, 80 Ind.App. 363, 141 N.E. 66, 69, the court refused to invoke an alleged public policy against a foreign contract, stating, "before so construing a statute, we should be fully con-

performance. It is not unusual however for courts to enforce a contract involving an illegal element. The effect to be given to an illegal element "depends upon the character of the illegality, the degree of fault and responsibility of the parties, the intent of the legislature in assessing penalties and in providing or limiting remedies, the persons for whose protection the particular element has been declared to be illegal, the extent of the forfeiture that refusal of relief will entail, and the manner in which the court can best subserve public interest and welfare." 6 Corbin on Contracts § 1533, p. 1050. Several cases have held that when a contract has been entered into lawfully, recovery will not be denied simply because the plaintiff has been guilty of a minor violation of the laws in the performance of his contract obligations. Dodge v. Richmond, 1960, 10 A.D.2d 4, 196 N.Y.S. 2d 477; Meissner v. Caravello, 1954, 4 Ill.App.2d 428, 124 N.E.2d 615; see Freeman v. Jergins, 1954, 125 Cal.App.2d 536, 271 P.2d 210; Ware v. Curry, 1880, 67 Ala. 274.

■ Staples asserts that he can show full performance of his contract obligation without relying on the acts performed in Alabama and hence to grant enforcement of the contract would not be inconsistent with the policy established by the Alabama Real Estate License Law. The meaning and effect of a statute must be considered in the light of its purpose, the mischief it is designed to correct, and the significance of the choice of machinery to accomplish the legislative purpose. Looking to these factors, we conclude that if Staples can show sufficient performance outside Alabama the contract should be enforced.

The object of this statute is to protect sellers and buyers of Alabama real estate from unethical practices of unregulated brokers which take place in Alabama. Here both the formation of the contract and the major portions of its perform-

ance occurred outside Alabama. The law is not framed, as it might have been, to apply to *all* transactions affecting *land* in the forum state. The coverage is limited to *Alabama* transactions. If a contract is an Alabama contract or is performed in Alabama, the state has a legitimate interest in regulating the transaction; its citizens expect the state's protection, and brokers should be alert to comply with the state's requirements. If, however, an Alabama citizen goes out of the state and enters into a contract that primarily is to be performed in a foreign state, he should expect to forego certain protections that his own state would afford, just as he becomes entitled to enjoy the protection of the foreign state. When only incidental parts of the transaction take place in the forum state, the remoteness of relation between forum policy and the significant acts bearing on the transaction, and the injustice of depriving a foreign citizen of the fruits of his labors because of a violation of local regulations weigh heavily in favor of enforcement of the contract. A contrary result favoring a purported policy of the forum would be as arbitrary as would be the selection of the law of the place of making, if selection of the latter law depended solely on the fortuitous circumstance that on a cross-country airplane flight the contracting parties happened to be over Missouri at the moment when they shook hands to the deal.

To accomplish the objective of the law the statute provides that for a first violation, a person shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment for a term not to exceed ninety days. For a second violation the fine and imprisonment are increased. If Staples violated the statute, he is still subject to fine and imprisonment, but this sort of machinery of enforcement is not necessarily inconsistent with his recovery of his commission under an executed foreign contract. This is not to say that

vinced of a legislative purpose to effect such result, as the just principle[s] of law, which holds every man to a fair and full performance of his contract,

where he has received a valuable consideration, should not be regarded lightly, and its application withheld, where doubt exists in that regard."

the Alabama legislature could not have chosen different machinery to accomplish its objective that might have barred Staples's recovery. Certain states, for example, have enacted licensing statutes requiring the courts to close their doors to suits for commissions by an unlicensed broker, regardless of the validity of the contract.[9] However, even where the statute does contain door-closing provisions some courts have allowed recovery if the cause of action can be established without reliance on the unlawful action. C. B. Snyder Realty Co. v. Sherrill-Noonan, Inc., 3 Cir., 1958, 261 F.2d 269.

■ While the statute is applicable to certain acts performed by Staples, this transaction is not of the sort at which the statute is primarily directed; and the acts to which the statute applies are collateral to the contract which Staples seeks to enforce. Under these circumstances the public policy argument thins into invisibility, and will not prevent enforcement of an otherwise valid contract. We hold that failure of Staples to take out a license in Alabama does not bar recovery of his commission.

### II.

The remaining question is whether Staples has shown a performance of his contract obligation on the basis of the services performed outside of Alabama.

The sufficiency of Staples's performance must be tested under Missouri law. Missouri courts have often stated:

"It is the general rule that a real estate broker is entitled to recover his commission on the sale of real estate if he shows himself to have been the procuring cause of the sale although the owner himself had finally consummated the sale. Of course, the rule is equally applicable whether the owner consummates the sale personally or through another broker. The owner cannot escape liability to a broker who is the procuring cause of a sale by employing another broker to consummate the transaction.

* * *" Barnum v. Hutchens Metal Products, 1953, 255 S.W.2d 807, 808.

An explanation of the term "procuring cause" is found in Real Estate Enterprises v. Collins, Mo.App. St. Louis 1953, 256 S.W.2d 286, 289:

"For one's services in such a matter to be the procuring cause of the sale, it is essential that his initial efforts in calling attention to the property shall have set in motion a series of events which, without a break in their continuity, and without interruption in the negotiations, eventually culminated in the sale. But where there is a definite break in the continuity of the negotiations amounting to an abandonment of the deal, and new forces thereafter enter which bring about a renewal of the negotiations and themselves become the effective cause of the sale, the initial efforts may not then be regarded as the proximate procuring cause so as to be the foundation on which to predicate a right to a commission."

Additional light is cast on the question by the opinion in Nichols v. Pendley, Mo. App.1960, 331 S.W.2d 673, 675:

"[W]e think we are within the bounds of reason in saying that, where the agent produces the prospect, and the prospect within a reasonable time thereafter buys on terms commensurate with the listed price, in the absence of any evidence to the contrary it should be presumed that such prospect-buyer was ready, willing, and able to buy * * *. And, given that showing, i. e., the production of a prospective purchaser who within a reasonable time thereafter buys at the listed price, it should be the owner's burden to show that the sale was not the result of the broker's procurement."

■ The record shows clearly that Staples fully met the requirements of Missouri law. It was Staples who found

9. See footnote 2.

Smith and Ginter, and interested them in the land. There is not the slightest suggestion that seller and buyers would have met or that the first negotiations would have occurred but for the plaintiff acting as the intermediary. The negotiations ran without a significant interruption from the first meeting of the parties in September 1958 until the closing of the transaction just three months later December 17. During this period Staples played a vital role in working out arrangements satisfactory to both sides, even excluding from consideration the trips he made to Florence, Alabama. He drove to Memphis to consult an accountant about the tax aspects of the transaction, he went to Canton, Mississippi and obtained a cashier's check for payment of the purchase price, he obtained a promise from Smith and Ginter that if the mortgage on the property could not be sold before the closing they would pay the entire purchase price in cash, and he conversed with the buyers and with Culver on several other occasions. Through these efforts he produced a buyer ready, willing, and able to buy on the defendants' terms. Although for two weeks in October it appeared that the sale might fall through, in due course the sale did occur. The conclusion is inescapable that Staples had laid the basis for the sale.

It is the broker who shakes the tree and not the one who runs up and gathers the fallen apples who is entitled to the commission.[10] Staples found and shook the tree. The defendants have their apples. They must pay Staples for them.

Judgment is

Affirmed.

10. Nichols v. Pendley, Mo.App.1960, 331 S.W.2d at page 675.