COLDWELL BANKER & COMPANY, et al., Plaintiffs-Appellees,

v.

Merlin KARLOCK, Defendant-Appellant.

No. 81–1446.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1981.

Decided Aug. 17, 1982.

Rehearing and Rehearing En Banc Denied Sept. 16, 1982.

Daniel E. Johnson, Baker & Daniels, Indianapolis, Ind., for defendant-appellant.

James M. Klineman, Klineman, Rose, Wolf & Wallack, Indianapolis, Ind., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, and SPRECHER * and POSNER, Circuit Judges.

CUMMINGS, Chief Judge.

This is a suit to collect a real estate broker's commission owed in connection with the sale of a 21,693 acre farm in northwestern Indiana. The district court granted summary judgment for the plaintiffs, and we affirm.

---

* Circuit Judge Robert A. Sprecher heard oral argument in this case, participated in the conference that followed, and voted to affirm. He

## I

The plaintiffs are Coldwell Banker & Company, a large real estate brokerage firm, and its wholly owned subsidiary Coldwell Banker Commercial Brokerage Company (hereinafter collectively referred to as "Coldwell"). Both are California corporations whose principal offices are in California. At all times relevant to this case, Coldwell was licensed as a real estate broker in Illinois and Indiana; it maintained offices in Illinois but not in Indiana.

The defendant, Merlin Karlock, is a resident of Bourbonnais, Illinois. Karlock is a successful businessman who has engaged in a number of banking, farming, and real estate development projects. In the spring of 1979, Karlock was the owner of approximately 21,693 acres of land in northwestern Indiana, commonly known as the Karlock Ranch.

On May 24, 1979, Karlock met with James McGrath, a real estate broker with Coldwell, to. discuss a possible sale of the Karlock Ranch through Coldwell. After the meeting the two took a brief tour of the Ranch. McGrath was an experienced real estate broker who was licensed in Illinois but not in Indiana. In early July of 1979, Karlock visited the office of the Indiana Real Estate Commission in Indianapolis. There he discovered that although Coldwell was a licensed real estate broker in Indiana, McGrath was not. Nevertheless, Karlock continued to do business with McGrath and others representing Coldwell.

By an agreement dated May 29, 1979, Karlock granted Coldwell the exclusive right to sell the Karlock Ranch for the period June 1, 1979, to September 1, 1979. Karlock agreed to pay Coldwell a 6% commission if:

(1) A purchaser is procured (whether by Broker, or the undersigned Seller, or anyone else) who is ready, willing and able to purchase said property at the price and on the terms above stated [$3600 per acre

died, however, on May 15, 1982, and did not participate in the preparation or approval of this opinion.

or $80,000,000 cash], or on any other price and terms agreeable to the undersigned Seller; or (2) Any contract for the sale of said property is entered into by the undersigned Seller.... App. 55.

The agreement further provided that if, within ninety days after the expiration of the listing agreement, the Ranch were sold to any person to whom Coldwell had submitted the property, Karlock would still be obligated to pay the broker's commission. *Id.* Finally, Coldwell agreed to "use its best efforts to effect a sale of [the Ranch]" in consideration of the exclusive right to sell the property. *Id.* The agreement was executed at Coldwell's Chicago office by Karlock and Michael Tomasz, a Coldwell employee licensed as a real estate broker in both Illinois and Indiana.

After the listing agreement was executed, McGrath received a tip from Coldwell's Los Angeles office that Prudential Insurance Company of America might be interested in purchasing the Karlock Ranch. McGrath contacted Mark Wilkinson, Prudential's vice president for real estate operations, and arranged for him to see the property. On June 14, 1979, McGrath, Karlock, Wilkinson, and Leslie Horsager, Prudential's Indiana real estate manager, spent approximately five hours touring the Ranch. The attributes of the property were discussed, but there were no negotiations as to the terms of any proposed sale.

On June 21, 1979, Horsager telephoned McGrath and informed him that Prudential was interested in the Ranch at a price of approximately $1,700 per acre. At McGrath's request, Horsager confirmed the conversation with a letter of the same date. On June 27, 1979, McGrath communicated Prudential's interest in the Ranch to Karlock. Karlock stated that he was willing to discuss the matter with Horsager personally, but that he wanted no Coldwell personnel present. McGrath and his superior, Robert S. Jackson, agreed to this, and McGrath arranged for Karlock and Horsager to meet in Lafayette, Indiana, on July 2, 1979. Thereafter, all negotiations for the sale of the Ranch were handled by Karlock

alone. When Coldwell later requested to participate in the negotiations, Karlock refused.

On July 31, 1979, Coldwell and Karlock executed two supplements to the listing agreement, extending the original agreement until November 1, 1979, and changing the broker's commission from a flat 6% of purchase price to a sliding scale running from 3% to 6% depending on the selling price per acre. These supplements were executed in Illinois.

In September of 1979 Karlock and Horsager agreed to the terms of the sale. Karlock then informed McGrath that an agreement with Prudential had been reached. On October 8, 1979, at Prudential's regional office in Cincinnati, Ohio, Karlock and Prudential executed an agreement granting Prudential an option to purchase the Karlock Ranch on or before December 31, 1979. On November 29, 1979, Prudential exercised the option in a letter sent from J. W. Pancoast, Prudential's regional vice president in Cincinnati, to Karlock at his office in Momence, Illinois. A formal agreement for the sale of the property was executed by Karlock and Pancoast on December 7, 1979. The final purchase price was $39,590,000 or $1,825 per acre. The closing was held on January 9, 1980, in Indianapolis. Coldwell's agents were excluded from all these transactions.

On January 9, 1980, the date of the closing, Coldwell filed this lawsuit in the Superior Court of Marion County, Indiana, at Indianapolis. The case was removed to federal court where Coldwell filed an amended complaint on March 10, 1980. Count I alleged that Coldwell was entitled to a commission of over $1 million in connection with the sale of the Karlock Ranch. Count II alleged that Karlock's failure to pay the commission when due was in bad faith, that Karlock was profiting from the delay, and that he should be liable for damages resulting from the delay. In his answer, Karlock asserted a number of affirmative defenses and counterclaimed against Coldwell for breach of its obligations under the exclusive listing agreement.

The district court granted summary judgment for Coldwell on Count I of its complaint and on Karlock's counterclaim. The court also allowed Coldwell its attorney's fees in accordance with the terms of the exclusive listing agreement. Karlock appeals these rulings.[1]

## II

Karlock's first affirmative defense below was that Coldwell is not entitled to collect a brokerage commission on the sale of the Karlock Ranch because Coldwell's activities in connection with the sale were performed by persons who were not licensed as real estate brokers in Indiana. Indiana, like many states, has a so-called closed-door statute that bars recovery of a real estate brokerage commission by an unlicensed broker. During the period relevant to this case, the Indiana statute read as follows:

> Sec. 9. In all actions for the collection of a commission or other compensation for the sale of real estate and filed in the courts of this state after October 1, 1949, it shall be alleged and proved therein that at the time the cause of action arose the party seeking relief was a duly licensed real estate broker or real estate salesman of the state of Indiana.

Ind.Acts 1949, c. 44, § 8 (current version at Ind.Code § 25–34.1–6–2 (1981 Cumulative Supplement)).

It is true that McGrath, the Coldwell broker who negotiated the listing agreement with Karlock and who produced Prudential as a purchaser, held no Indiana broker's license. It is also true that the Karlock Ranch is located in Indiana. Karlock argues that under the Indiana statute these facts bar Coldwell from recovering a commission on the sale of the Karlock Ranch. The district court rejected this defense, however, finding that the exclusive listing agreement was a contract for personal services rather than a real estate contract. The court determined that such an agreement should be governed by Illinois law, under which McGrath's lack of an Indiana real estate broker's license is irrelevant. We agree.[2]

A real estate brokerage contract is generally characterized as a contract for personal services rather than a contract conveying an interest in land. *See, e.g.; Richland Development Co. v. Staples*, 295 F.2d 122, 125 (5th Cir. 1961); *Aritex Land Co. v. Arnold*, 16 Ariz.App. 547, 494 P.2d 747, 748 (1972); *In re Stoddard's Estate*, 60 Wash.2d 263, 373 P.2d 116, 118 (1962); Annot., 159 A.L.R. 266, 267 (1945). As such it must be interpreted according to principles of contract law. The course of dealings between Coldwell and Karlock, however, involved contracts with several states. Because the parties did not specify in the contract which state's law was to govern, it

1. Count II of Coldwell's complaint was dismissed by the district court and is not a subject of this appeal.

2. The parties argue that the issue in this case is controlled either by our opinion in *Reed v. Kelly*, 177 F.2d 473 (7th Cir. 1949), or by our more recent decision in *Paulson v. Shapiro*, 490 F.2d 1 (7th Cir. 1973). We believe, however, that those cases are distinguishable from the dispute at bar. Both cases required us to interpret the Wisconsin closed-door statute. In *Reed*, we held that an Illinois broker suing a Wisconsin resident for a commission on the sale of Wisconsin real estate could not recover the commission because the broker was not licensed in Wisconsin. Our decision was specifically based, however, on the Wisconsin closed-door statute as it had been interpreted by Wisconsin courts. *Reed v. Kelly*, 177 F.2d at 475. In a similar case almost twenty-five

years later, we reversed a grant of summary judgment to a Wisconsin seller of Wisconsin real estate in a suit for a brokerage commission. *Paulson v. Shapiro*, 490 F.2d 1 (7th Cir. 1973). We held that the Wisconsin closed-door statute did not apply because the record below did not demonstrate that the plaintiff had acted "in the capacity of a broker" within the State of Wisconsin. *Id.* at 4. Although it was unnecessary to address the question in *Paulson*, we specifically noted that even if the facts had been otherwise, we might not have applied Wisconsin's law because of conflict-of-laws principles. *Id.* at 5. Today we reach the issue of whether choice-of-law considerations preclude the application of the Indiana closed-door statute. Because we hold that they do and that Illinois law governs the agreement at issue here, Coldwell may recover its commission for the sale of the Karlock Ranch.

is necessary for the court to make that determination.[3] A federal court sitting in diversity must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Our inquiry is, therefore, governed by the Indiana choice-of-law rules applied to contract disputes.[4]

In *W. H. Barber Co. v. Hughes*, 223 Ind. 570, 63 N.E.2d 417 (1945), the Indiana Supreme Court stated that a contract is governed by the law of the state where it is made, and that a contract is deemed made in the state where the last act necessary to make it a binding agreement occurs. In the same opinion, however, the Indiana court became one of the first to suggest the use of what has come to be known as the "most significant relationship" approach in determining what law to apply in contract disputes:

> The court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact.

223 Ind. at 586, 63 N.E.2d at 423. This approach has since been elaborated in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971).

Since *W. H. Barber Co.* there has been some confusion over which choice-of-law rule applies in Indiana.[5] We think it clear, however, that in most contract cases Indiana has adopted the most significant relationship analysis outlined in the Second Restatement. This analysis was most recently summarized in *Utopia Coach Corp. v. Weatherwax*, 379 N.E.2d 518 (Ind.App. 1978):

> Where ... the court is *not* satisfied that the parties have chosen the state law to be applied, the court will apply the law of the state having the most significant relationship to the transaction. The court considers such factors as: the place of contract; the place of negotiation; the place of performance; the location of the subject matter; and the domicile or place of incorporation and place of business of the parties.

*Id.* at 522.

█ Thus, sitting as an Indiana court in this contract dispute, we must look to the law of the state with the most significant relationship to the transaction. Under such an analysis, we agree with the district court that Illinois law governs the exclusive listing agreement between Coldwell and Karlock.[6] Both the original contract and the

---

3. Although four or five states conceivably had contacts with this transaction, only Illinois and Indiana had the significant contacts that would merit application of their law to the exclusive listing agreement. We will limit our inquiry, therefore, to determining whether Illinois or Indiana law governs this contract.

4. The need to decide whether Indiana or Illinois law governs the contract here is obvious. Indiana has a statute that closes the doors of its courts to suits by brokers unlicensed in Indiana to recover real estate commissions. If Indiana law governs this agreement, McGrath's lack of an Indiana real estate license arguably would bar Coldwell from recovering its commission. Illinois does not, of course, have any statutes concerning the licensing of real estate brokers in Indiana. If Illinois law governs the contract, the Indiana closed-door statute is irrelevant to this suit and does not bar Coldwell's recovery. This conflict makes it necessary for us to determine whether Indiana or Illinois law controls the exclusive listing agreement between Coldwell and Karlock.

5. Although the Indiana courts have been less than clear about which choice-of-law rule obtains in Indiana, this Court may have contributed to the confusion. *Compare State Auto. Mut. Ins. Co. v. Spray*, 547 F.2d 397, 400 (7th Cir. 1977) (stating that the RESTATEMENT (SECOND) most significant relationship analysis is the choice-of-law rule in Indiana), *with Brown v. Universal C.I.T. Credit Corp.*, 331 F.2d 246, 247 (7th Cir. 1964) (applying the First Restatement rule that the law of the place where the contract was made governs with regard to the nature, validity, obligation, and interpretation of the contract). This confusion was recognized and, we hope, at least partly dispelled by Judge Tone's opinion in *Bowen v. United States*, 570 F.2d 1311, 1319 & n.18 (7th Cir. 1978).

6. Even if Indiana did not use the most significant relationship choice-of-law rule, we would still find that Illinois law governs this contract. The older rule was that the law of the state where the contract was made governs with regard to the nature, validity, obligation, and

agreement extending it were negotiated and executed in Illinois. Karlock is an Illinois resident. Coldwell is licensed to do business in Illinois and was represented in this transaction by its Illinois employees. Performance of the contract—procuring a purchaser ready, willing, and able to purchase the property—was accomplished primarily through letters and telephone calls by and to Coldwell's employee McGrath at his office in Illinois.[7]

The only significant contact that Indiana has to this contract is that the subject matter of the contract, the Karlock Ranch, is located there. Although we do not intend to belittle the legitimate interest of the State of Indiana in agreements relating to real property located in Indiana, this single factor simply does not outweigh the many significant contacts between the State of Illinois and the contract at issue here.

■ Karlock argues, however, that it would violate Indiana public policy to allow Coldwell to recover a commission in the face of a statute that closes the doors of Indiana courts to unlicensed real estate brokers. Karlock is correct that a court may refuse to enforce a contract that is valid elsewhere if it conflicts with the forum state's public policy. *See Richland Development Co. v. Staples*, 295 F.2d 122, 126 (5th Cir. 1961). We find, however, that permitting recovery on the exclusive listing agreement between Coldwell and Karlock does not violate Indiana public policy.

This Court has previously held that "[t]he purpose of the Indiana Real Estate Licensing Act is to protect its [Indiana's] citizens from possible loss at the hands of incompetent or unscrupulous persons acting as brokers." *Schreibman v. L. I. Combs & Sons, Inc.*, 337 F.2d 410, 412 (7th Cir. 1964). This policy is not implicated in this case, where neither the buyer, the seller, nor the broker is a citizen of Indiana. Furthermore, to hold that the Indiana statute bars Coldwell's recovery of its commission would make "it possible for one who has employed a competent broker and benefited from his services to repudiate the listing contract and deprive the broker of his commission." *Id.* at 413. Such a result would be particularly unjust here, where Karlock knew that McGrath was not licensed in Indiana long before the expiration of the listing agreement, yet he continued to do business with Coldwell, agreed to an extension of the original listing agreement, and reaped the benefits of Coldwell's efforts in his behalf by selling his property to Prudential.[8] Under these circumstances, enforcing the terms of the listing agreement does not violate Indiana public policy.

We hold, therefore, that Illinois has the most significant relationship to this contract for personal services and that the district court was correct to apply Illinois law to the exclusive listing agreement be-

interpretation of the contract. *See Brown v. Universal C.I.T. Credit Corp.*, 331 F.2d 246, 247 (7th Cir. 1964); RESTATEMENT OF CONFLICT OF LAWS §§ 311, 332 (1934). Matters of performance were to be controlled by the law of the place of performance. *See* the latter authority at §§ 355, 358. The exclusive listing agreement between Coldwell and Karlock was negotiated and executed in Illinois, with the apparent intent that Coldwell's performance originate in Illinois. Moreover, with the exception of McGrath's two brief visits to the Ranch in Indiana, all of Coldwell's efforts to locate a purchaser and actual contacts with the ultimate purchaser occurred in Illinois. Because of these facts, we would find that the contract was made and performed in Illinois and is, therefore, governed by Illinois law.

7. Although McGrath accompanied Karlock and the ultimate purchasers on a tour of the Ranch

in Indiana, no negotiations occurred at that time, and an Indiana court has recently held that merely showing property does not necessarily constitute negotiations for the sale of the property. *See Barrick Realty Co. v. Bogan*, 422 N.E.2d 1306, 1308 (Ind.App.1981).

8. By agreeing to an extension of the listing agreement after having discovered that McGrath was not a licensed real estate broker in Indiana, Karlock may have waived any defense based on the Indiana licensing statute. *See, e.g., Eisenberg v. Goldstein*, 29 Ill.2d 617, 622, 195 N.E.2d 184, 186–87 (1963), *cert. denied*, 377 U.S. 964, 84 S.Ct. 1645, 12 L.Ed.2d 735 (1964). The parties neither briefed nor argued this issue, however, and our decision that Illinois law governs the exclusive listing agreement makes it unnecessary for us to address the question.

tween Coldwell and Karlock. Thus Indiana's closed-door statute does not bar Coldwell's recovery of its commission on the sale of the Karlock Ranch.

### III

Karlock's objections to the district court's rulings on his second, third, and fourth affirmative defenses can be considered together. Karlock argues that Coldwell breached the exclusive listing agreement by not exerting its "best efforts" to effect a sale of the Karlock Ranch, that there has been a failure of consideration under the listing agreement, and that Coldwell is estopped to recover under the contract because it failed to fulfill promises made at the time the listing agreement was executed.[9] None of these arguments defeat Coldwell's claim to the broker's commission.

### A

Karlock's breach of contract claim rests on his assertion that Coldwell contracted to use its "best efforts" to effect a sale of the Karlock Ranch, yet it failed to do so. Because Coldwell did not exert its best efforts, Karlock argues, Coldwell has breached the contract and Karlock is relieved of any duty to pay the broker's commission.

We find Karlock's argument unpersuasive. The exclusive listing agreement between Coldwell and Karlock clearly stated that the commission would be paid if Coldwell produced a ready, willing, and able purchaser.

> The undersigned Seller [Karlock] agrees to pay Broker [Coldwell] a sales commission .... This commission shall be paid for services rendered during the term of this Agreement if: (1) A purchaser is procured ... who is ready, willing and able to purchase said property at the price and on the terms above stated [$80,000,000], or on any other price and terms agreeable to the undersigned Seller .... App. 55.

Since Coldwell produced a ready, willing, and able purchaser, its right to the broker's commission appears to be beyond question.

We recognize our responsibility, however, to construe the contract as a whole. *Martindell v. Lake Shore National Bank*, 15 Ill.2d 272, 283, 154 N.E.2d 683, 689 (1958). "The primary object of the construction of a contract is to give effect to the intention of the parties, greater regard being given to such intent, when clearly revealed, than to any particular words used in expression thereof." *Id.* Karlock argues that, looking at the exclusive listing agreement as a whole, it is apparent that Coldwell's right to the broker's commission is dependent on its having exerted its best efforts to find a purchaser for the Karlock Ranch.

■ Although a real estate brokerage agreement is ordinarily a unilateral offer to pay a commission if the broker produces a ready, willing, and able purchaser, the agreement can become bilateral if the broker makes a return promise, such as promising to perform diligently. 1A A. CORBIN, CONTRACTS § 154, at 21 (1963). The basic agreement still remains that the seller will pay a commission to the broker if the broker produces a ready, willing, and able purchaser. Thus the seller has agreed to pay a commission for *finding* a purchaser, not for using one's best efforts to *look* for a purchaser. *Id.* § 154, at 22.[10]

■ It is clear that producing a ready, willing, and able purchaser for the Karlock Ranch was at the heart of this agreement.

---

9. Karlock's failure of consideration defense is factually and legally indistinguishable from his material breach of contract argument. We therefore consider both defenses in part IIIA of this opinion under the rubric of breach of contract. *See* J. CALAMARI & J. PERILLO, CONTRACTS § 158 (1970).

10. The parties have argued extensively over whether the exclusive listing agreement is a bilateral or a unilateral contract. Many commentators have criticized this distinction, *see, e.g.,* J. CALAMARI & J. PERILLO, CONTRACTS § 38 (1970); RESTATEMENT (SECOND) OF CONTRACTS § 12, Reporter's Note (Tent. Draft No. 1, Student Ed., 1973), and it is of particularly little use here. We agree with the district court that in view of Coldwell's performance it is immaterial whether the agreement is classified as unilateral or bilateral.

When Karlock sold the Ranch to Prudential, he had received the performance he had bargained for and the commission was due. If Prudential's offer was unsatisfactory, Karlock did not have to accept it. But for Karlock to accept an offer from a purchaser produced by Coldwell, complete the sale to that purchaser, and then refuse to pay Coldwell its commission has no basis in law or reason. To say that some hypothetical purchaser at a better price might have been found had Coldwell tried harder is irrelevant. Karlock accepted Coldwell's performance when he sold the Ranch to Prudential. He must now perform his own obligation under the exclusive listing agreement and pay Coldwell its commission.[11]

### B

■ Karlock's final affirmative defense before the district court was that Coldwell should be estopped to recover on the contract because Coldwell obtained the exclusive listing agreement and the extension of that listing "on the basis of express promises to employ specific marketing techniques which Coldwell failed to use."[12] Karlock's Br. at 40. The district court rejected this argument, holding that the written agreement between the parties superseded any previous negotiations, and that a contemporaneous parol agreement could not vary the terms of a written one.

On appeal Karlock argues that the district court erred in rejecting his promissory estoppel defense, citing *Ehret Co. v. Eaton, Yale & Towne, Inc.*, 523 F.2d 280 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 186 (1976), for the proposition that the execution of a written agreement does not foreclose the application of estoppel in a contract action. At issue in *Ehret* was a cancellation clause in an exclusive sales representative's contract. When the agreement was being negotiated, the plaintiff-representative had expressed concern about the cancellation clause. The defendant-manufacturer responded in a detailed letter explaining that the clause could not be deleted but that it had always been generously interpreted. This Court treated the letter as though it had replaced the cancellation clause and become part of the contract. The Court then held that the defendant was estopped from asserting the strict terms of the original cancellation clause as a defense.

*Ehret* is clearly distinguishable from this case. In *Ehret*, there was a letter, written in response to a direct request by the plaintiff, that was evidence of the contract modification. This evidence demonstrated that the modification was essential to induce the plaintiff to assent to the contract. Here, on the other hand, there is no such evidence. Nothing in the pleadings, nor in the depositions and exhibits submitted by Karlock, indicates that any statements made by McGrath or others at Coldwell rose to the level of enforceable promises that would modify the written agreement between the parties. The alleged promises upon which Karlock rests his estoppel claim were, for the most part, merely statements by McGrath regarding his own ideas for marketing the Karlock Ranch and generalities about Coldwell's capabilities. They are simply incapable of the construction that Karlock seeks to give them. "Usually the question of estoppel is for the jury except where, as in this case, the facts presented leave but one inference; then it becomes a question of law." *Ehret Co. v. Eaton, Yale & Towne, Inc.*, 523 F.2d 280, 283 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 186 (1976). Because the facts here leave but one inference, the district court was correct in rejecting Karlock's defense of promissory estoppel.

### IV

■ In addition to his affirmative defenses to Coldwell's complaint, Karlock

---

11. We might have reached a different conclusion if there were some indication of fraud or collusion between Coldwell and Prudential. There is absolutely no such indication, however, in the record.

12. In the pleadings below Karlock also raised the defense of fraud in the inducement. App. 43. Because there has been no mention of this argument on appeal, we deem it waived.

filed a counterclaim against Coldwell. The counterclaim alleged that Coldwell breached the exclusive listing agreement by not exerting its best efforts to find a ready, willing, and able purchaser for the Karlock Ranch. Karlock further alleged that

(1) Coldwell knew when it obtained the exclusive listing that Karlock required a prompt cash sale of his Ranch because of pressure from major creditors, (2) Coldwell could therefore reasonably foresee that Karlock would accept a sale at a price less than could be obtained if Coldwell failed to perform as it agreed to do and (3) Karlock was compeled [*sic*] to sell his Ranch for less than he would have obtained if Coldwell had fully performed.

Karlock's Br. at 43. Karlock sought damages in an amount equal to the difference between what the Ranch actually sold for and what it could have sold for had Coldwell "fully performed."

The short answer to Karlock's argument is simple: by selling the Ranch to Prudential, Karlock accepted Coldwell's performance.[13] That he now believes that a higher price might have been obtained for the Ranch is immaterial. Coldwell cannot be held responsible for Karlock's poor judgment in accepting a low offer, if indeed that offer was too low.

Karlock attempts to avoid this result by asserting that he was forced to accept Prudential's offer because of economic distress. Had his financial condition been healthier, Karlock claims, he would not have sold the Ranch at the price Prudential offered and would not have suffered the damages alleged. It is well settled though that economic distress is not a defense to an action on a contract unless such distress was caused by the party seeking to enforce the contract. *See French v. Shoemaker*, 81 (14 Wall) U.S. 314, 333, 20 L.Ed. 852 (1871); *Lawrence v. Muter Co.*, 171 F.2d 380, 382 (7th Cir. 1948), *cert. denied*, 337 U.S. 907, 69 S.Ct. 1049, 93 L.Ed. 1720 (1949). Karlock's own pleadings reveal that his economic distress was the result of "the press of certain major creditors," and was not due to any actions by Coldwell or Prudential. Karlock's Answer and Counterclaim at 14, App. 47. Any damage Karlock may have suffered by accepting Prudential's offer flowed from his own decisions and actions; he cannot now attempt to hold Coldwell liable for that damage. The district court, therefore, correctly rejected Karlock's counterclaim and entered judgment for Coldwell.[14]

## V

Finally, Karlock challenges the propriety of the district court's grant of summary judgment on Karlock's second, third, and fourth affirmative defenses and his counterclaim. Coldwell and Karlock filed cross-motions for summary judgment with respect to the real estate licensing question, but Coldwell's motions as to Karlock's other affirmative defenses and counterclaim were motions for judgment on the pleadings. The district court converted all motions to motions for summary judgment with the following explanation:

Inasmuch as the Court has read all of the numerous depositions filed by the parties, and will refer to facts derived from them in making its rulings herein, all of plaintiffs' motions will be considered as motions for summary judgment.

*Coldwell Banker & Co. v. Karlock*, No. IP 80–28–C, slip op. at 1 (S.D.Ind. Feb. 19, 1981). Karlock argues that the district court's failure to give advance notice that it would consider the motions as ones for summary judgment prevented Karlock from submitting affidavits and other evidence in support of his position. Such procedures, according to Karlock, violate Rules 12 and 56 of the Federal Rules of Civil Procedure and constitute reversible error.

A district court should provide the parties with notice and an opportunity to present affidavits and other evidence when it intends to treat motions for judgment on the pleadings as motions for summary judg-

---

**13.** *See* part IIIA of this opinion.

**14.** *See* note 11, *supra*.

ment. Fed.R.Civ.P. 12(c), 56(c). Although the failure to provide such notice may require reversal in many cases, we do not find it to be reversible error in this case. *See Milwaukee Typographical Union No. 23 v. Newspapers, Inc.,* 639 F.2d 386, 391 (7th Cir.), *cert. denied,* 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 119 (1981); *Chicago-Midwest Meat Association v. City of Evanston,* 589 F.2d 278, 282 (7th Cir. 1978), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979). Here both sides had moved for partial summary judgment, thereby requesting the district court to consider materials outside the pleadings. Moreover, the parties had submitted thousands of pages of deposition testimony and other exhibits, most of which had nothing to do with the motions for summary judgment on the real estate licensing question. Thus both parties clearly were prepared for the district court's action, and the court had an abundance of material from which it could determine that summary judgment was appropriate.

Summary judgment on Karlock's contract defenses and counterclaim also was appropriate because Karlock's answer admitted the very fact upon which the district court's decision rested, namely, that Coldwell found the purchaser of the Karlock Ranch. Karlock concedes in his brief that "the principal basis of the lower court's decision—that Coldwell is entitled to a commission because Karlock sold to a buyer produced by Coldwell—was procedurally permissible inasmuch as Karlock's answer admitted the fact on which it was based." Karlock's Br. at 48. Karlock argues nevertheless that summary judgment was improper to the extent that it derived from matters outside the pleadings. After a careful study of the district court's opinion, we conclude that although the judge referred to other matters, the fact of Coldwell's performance was the primary basis for his decision and was a sufficient predicate for the grant of summary judgment. Because Karlock has admitted that fact, summary judgment was appropriate. We therefore find no error in the district court's disposition of Karlock's affirmative defenses and counterclaim.

VI

For the foregoing reasons, the judgment of the district court is AFFIRMED.