**F. McCONNELL AND SONS, INC., Plaintiff,**

v.

**TARGET DATA SYSTEMS, INC., Defendant.**

No. 1:98–CV–312.

United States District Court, N.D. Indiana, Fort Wayne Division.

Feb. 2, 1999.

Alan VerPlanck, James Fenton, Eilbacher Scott Inc., Fort Wayne, IN, for F. McConnell and Sons Inc.

Martin T. Fletcher, Sr., Rothberg and Logan, Fort Wayne, IN, Brian P. Daniels, Brenner Saltzman and Wallman, New Haven, CT, for Target Data Systems Inc.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

### I. INTRODUCTION

On October 9, 1998, the Plaintiff, F. McConnell & Sons, Inc. ("M & S") filed the underlying diversity action alleging a breach of contract. The matter currently before the Court is the motion to dismiss filed by the Defendant, Target Data Systems, Inc. ("Target"), on November 9, 1998, which contends that the Court lacks personal jurisdiction over Target, and in the alternative that the complaint fails to state a claim upon which relief can be granted. M & S filed a response to the motion on December 15, 1998, and Target filed a reply on December 30, 1998. The factual record before the Court includes the affidavits of Steven Darn ("Daren aff. ¶ __"), Paul Freeman ("Freeman aff. ¶ __"), Sam Flannery ("Flannery aff. ¶ __"), James McConnell ("McConnell aff. ¶ __"), and Paul Offerle ("Offerle aff. ¶ __").[1] For the reasons hereinafter pro-

---

1. Pursuant to representations from counsel, the Court advised the parties that the affidavits submitted in conjunction with the parties' briefs would only be considered in adjudicating the personal jurisdiction issue under Fed. R.Civ.P. 12(b)(2), and would not be relied upon in determining whether the complaint states a redressable claim, and that correspondingly the Rule 12(b)(6) motion would not be converted to a motion for summary judgment. *See* Order, November 24, 1998 (Docket # 11).

vided, Target's motion to dismiss for lack of personal jurisdiction will be DENIED, and its motion to dismiss for failure to state a claim will be GRANTED in part and DENIED in part.

## II. FACTUAL BACKGROUND

According to the Complaint, Target is a Connecticut corporation having its principal place of business in Connecticut, and M & S is an Indiana corporation whose principal place of business is New Haven, Indiana. (Pl.Compl.¶¶ 1–2.) Indeed, Target's facilities consist solely of its offices located in New London, Connecticut (although Flannery, who has been a Target employee since 1996, does operate out of offices in Maryland and Delaware), while M & S's only facility, a 60,000 square foot warehouse, is located in New Haven, Indiana. (Daren aff. ¶ 6; Flannery aff. ¶¶ 2–4; McConnell aff. ¶ 4.) None of Target's shareholders, officers, or directors reside in Indiana, nor does Target own any real estate or maintain a bank account or telephone listing in Indiana. (Daren aff. ¶¶ 7–8.) Indeed, Target is not registered or licensed to do business in Indiana. (Daren aff. ¶ 9.)

Target is in the business of developing and licensing computer software designed to assist wholesale food distributors in managing every aspect of their business. (Daren aff. ¶ 3.) The first program developed and marketed by Target is called the "Distributor 4GL," which allows "broadline food service distributors" (that is, entities which distribute food-related products to wholesale distributors) to run every aspect of their company. (Daren aff. ¶ 5.)[2] However, Distributor 4GL is not designed for entities who distribute products to "retail" sales locations such as convenience stores, which sell candy and tobacco products. *Id.* Tobacco products in particular require

special tax treatment that can vary from state to state. (McConnell aff. ¶ 5.)

M & S is a food distributor, and is in the business of supplying food-related products to both broadline food service distributors and retail industries, such as convenience stores. (*Id.* ¶¶ 4–5.) Prior to its relationship with Target, M & S began developing its own software package that would assist it and its customers in the supply and reordering of inventory in its retail business. (*Id.* ¶ 7.)[3] Beginning around 1992 or 1993, M & S developed a "retail module" that could run on its own computers, but the cost of developing its own complete retail module forced it to begin looking in the market for software packages designed to run the distribution, inventory, and accounting aspects of its retail distribution business. (*Id.* ¶¶ 8, 11.) At this time few such software packages existed, but in due course, Target and M & S crossed paths.

In 1993 McConnell, the president and CEO of M & S, met with Flannery, then an employee of an independent sales representative of Target, at an industry trade show. (*Id.* ¶ 9.) McConnell and Flannery discussed the Distributor 4GL software, and McConnell demonstrated an interest in licensing this software from Target. (*Id.* ¶ 9.) McConnell and Julius Fingerle, M & S's computer programmer, subsequently traveled to Connecticut in May of 1994 and met with Flannery and Freeman, vice-president and secretary of Target, to see a demonstration of Distributor 4GL and to further discuss the licensing of the software. (Freeman aff. ¶ 14.)

Although the affidavits submitted by the parties are not crystal clear, it appears that in early June of 1994 M & S agreed to purchase a Distributor 4GL User license with software code from Target for $45,-

---

**2.** The aspects of a broadline food service distributorship which the Distributor 4GL is designed to run include order processing, routing, payroll, receiving, purchase order processing, inventory control, etc. (Freeman aff. ¶ 4).

**3.** The parties appear to use the terms "software package" and "retail module" interchangeably when referring to the computer program both envisioned would run aspects of the retail food distribution business, and we shall follow suit.

000, with the understanding that M & S would develop a retail module to be incorporated into the Distributor 4GL system. (McConnell aff. ¶ 11.) The parties specifically contemplated that this process would require M & S to make significant modifications to the Distributor 4GL package, and that Target would act in an advisory capacity to M & S to ensure that these modifications were properly executed. (Pl. Compl. Exh. A ¶ 5.) M & S also agreed to serve as a demonstration site for prospective buyers of the retail module, so that these buyers could see Target's Distribution 4GL system "up and running" in a real world application. (McConnell aff. ¶ 17.) In consideration for developing the retail module and for serving as a demonstration site, M & S was to receive from Target a commission on future licenses sold by Target for the Distributor 4GL software.[4] (Pl.Compl.Exh. A.¶ 3.)

The creation of the retail module by M & S and its incorporation into the Distributor 4GL system was a formidable and technically complex undertaking that required a great deal of collaboration between the computer programmers of M & S and Target. (*See generally* Offerle aff.) Indeed, the contract itself provided that Freeman, Target's computer programmer, would travel to M & S's facility in Indiana for three days of on-site training. (Pl.

Compl.Exh. A.¶ 7.) Freeman in fact visited M & S in November 1994 to assist with various technical difficulties, in February 1995 to train Paul Offerle, who had recently replaced M & S's previous computer programmer, and again in January 1996 to assist in incorporating the retail module created by M & S into the Distributor 4GL software. (Freeman aff. ¶¶ 26–28.)[5] In addition to Freeman's visits to M & S, Target employee Dennis Lincoln apparently spent three days at M & S in September 1995 "to get some hands-on feel of the new system as well as identification of any changes that we feel must be made prior to cut over to the new system." (Offerle aff. ¶ 18 & Exh. 4.)[6] In addition to the four visits to M & S in Indiana by Target employees, Target and M & S communicated frequently by phone, fax, and E-mail in order to complete the retail module. (Offerle aff. ¶¶ 15, 19.) Moreover, Target provided M & S a computer modem that enabled Target to "dial in" to M & S, thus allowing Target access to the software code the companies were developing. (Offerle aff. ¶¶ 8–11.)[7]

According to Target, the collaborative effort was largely fruitless because it contends that M & S never produced a commercially viable retail module. Nevertheless, it appears that M & S did in fact serve as a demonstration site for other

---

4. The merits of the underlying breach of contract action focus on the commission term of the alleged contract. M & S argues that the contract provides for it to receive a commission on each and every Distributor 4GL software license that Target has sold since the date of the contract, regardless of whether that software included the retail module developed by M & S. Target, on the other hand, argues that under the contract M & S is to receive commissions only on license sales of the Distributor 4GL software that included the retail module developed by M & S.

5. The parties refer to this event as either the "cutover" of the M & S retail module to the Distributor 4GL system, or in the more colloquial phrase of "going live." (*See* Freeman aff. ¶ 28.)

6. Target apparently overlooked Lincoln's extended visit to M & S's facility in Indiana when it represented to the Court that "Target's representatives have been in Indiana on only 3 occasions." Def. Br. in Supp. of Mot. to Dis. at 16; *see also id.* at 9, rhet. ¶ 32 (Freeman's three visits "constitute the only times Target has had representatives in the State of Indiana in connection with the [M & S contract].").

7. Target argues that the fact that it had dial up access to M & S's facility is irrelevant because the Offerle affidavit makes no mention as to how often, if ever, Target utilized this access in its collaborations with M & S to develop the retail module. In light of the totality of the circumstances approach the Court applies to the personal jurisdiction inquiry, as explained *infra*, Target's retained capability to dial in to M & S in Indiana and assist in developing the retail module from literally anywhere in the world is certainly relevant to the personal jurisdiction inquiry.

potential customers of Target's Distribution 4GL software, because several businesses, including two Indiana companies, visited M & S to see Distribution 4GL in a real world operating environment. (McConnell aff. ¶¶ 17–18, 21.) Target and M & S later discussed other possible business ventures, but none of them ever came to fruition.

## III. DISCUSSION

### A. Personal Jurisdiction

■ "When the issue of personal jurisdiction is raised via a Rule 12(b)(2) motion to dismiss, the burden of proof rests on the party asserting jurisdiction." *Charlesworth v. Marco Mfg. Co.*, 878 F.Supp. 1196, 1199 (N.D.Ind.1995) (citation omitted); *see also RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir.1997) (citation omitted). When deciding a Rule 12(b)(2) motion, the court may receive and weigh affidavits, exhibits or other evidence submitted by the parties, but must construe all facts concerning jurisdiction, including factual disputes, in favor of the plaintiff. *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215 (7th Cir. 1984); *Charlesworth*, 878 F.Supp. at 1199.

This Court recently recited the basic principles governing the personal jurisdiction inquiry as follows:

> A federal district court exercising diversity jurisdiction has personal jurisdiction over a nonresident defendant "only if a court of the state in which it sits would have such jurisdiction." *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1243 (7th Cir.1990), *cert. denied,* 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991) (quoting *Turnock v. Cope*, 816 F.2d 332, 334 (7th Cir.1987)). The *Wilson* court explained that a two-step procedure is traditionally employed when determining whether a state court would have jurisdiction over a nonresident defendant. First, we examine whether the state long-arm statute allows jurisdiction, and second, we determine whether the assertion of jurisdiction complies with constitutional due process standards. *Wilson,* 916 F.2d at 1243 (citations omitted). It is well established that Indiana's long-arm statute extends personal jurisdiction to the limit allowed under the Due Process clause of the Fourteenth Amendment, and therefore we need only consider whether the assertion of jurisdiction over [Target] violates due process. *See, e.g., NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A.,* 28 F.3d 572, 580 (7th Cir. 1994) (citing *Wilson,* 916 F.2d at 1243).

> The due process analysis requires that a nonresident defendant have "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).

*Andersen v. Sportmart, Inc.,* 179 F.R.D. 236, 238–39 (N.D.Ind.1998) (internal footnote omitted).

#### 1. Minimum Contacts

"[T]he substance of the 'minimum contacts' analysis depends upon whether a plaintiff seeks to assert 'general' or 'specific' jurisdiction over a defendant." *Id.* at 239 (citing *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1277 (7th Cir.1997)). M & S wisely concedes, albeit implicitly, that this Court does not have general jurisdiction over Target, and therefore we shall limit our discussion to specific jurisdiction.[8]

The Seventh Circuit recently explained that:

> [i]n specific jurisdiction cases, we must decide whether a defendant has "purposefully established minimum contacts within the forum State" and consider

---

**8.** Courts obtain general jurisdiction over a defendant only if the defendant has "continuous and systematic contacts" with the forum state. *Andersen,* 179 F.R.D. at 240 (citation omitted). M & S does not seriously dispute Target's evidence showing that it does not have continuous and systematic contacts with Indiana.

whether, by traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–77, 105 S.Ct. 2174, 2184–85, 85 L.Ed.2d 528 (1985). Crucial to the minimum contacts analysis is a showing that the defendant "should reasonably anticipate being haled into court [in the forum State]," *id.* at 474, 105 S.Ct. at 2183 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)), because the defendant has "purposefully avail[ed] itself of the privilege of conducting activities" there, *Burger King,* 471 U.S. at 474–75, 105 S.Ct. at 2183 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)). *RAR, Inc.,* 107 F.3d at 1277. "This requirement of some deliberate or purposeful conduct or availment on the defendant's part ensures that a defendant will not be hailed into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Enviroplan, Inc. v. W. Farmers Elec. Coop.,* 900 F.Supp. 1055, 1059 (S.D.Ind.1995) (citing *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183) (internal citations omitted).

 Moreover, "the minimum contacts inquiry is one that examines the totality of the circumstances," *Mid–America Tablewares, Inc. v. Mogi Trading Co., Ltd.,* 100 F.3d 1353, 1361 (7th Cir.1996) (citing *Northrup King Co. v. Compania Productora Seillas Algodoneras Selectas S.A.,* 51 F.3d 1383, 1388 (10th Cir.1995)), and therefore "turns on a particularized assessment of the 'relationship among the defendant, the forum, and the litigation.'" *Hexacomb Corp. v. Damage Prevention Prods. Corp.,* 905 F.Supp. 557, 562 (N.D.Ind.1995) (quoting *Saylor v. Dyniewski,* 836 F.2d 341, 344 (7th Cir.1988) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977))). Additionally, specific jurisdiction requires not only minimum contacts, but also that the litigation "arise out of" or "be related to" those minimum contacts.

*RAR, Inc.,* 107 F.3d at 1277; *Hexacomb,* 905 F.Supp. at 563 (quoting *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984)). In a breach of contract case such as this one, "it is only the 'dealings between the parties in regard to the disputed contract'" that are relevant to minimum contacts analysis. *RAR, Inc.,* 107 F.3d at 1278 (quoting *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,* 75 F.3d 147, 153 (3d Cir.1996)); *see also Wisconsin Elect. Mfg. Co. v. Pennant Prods., Inc.,* 619 F.2d 676, 678 (7th Cir. 1980) (to establish personal jurisdiction in a contract case, the defendant's activities must "relate to the formation or performance of the contract"). Against this backdrop, M & S argues that Target's physical visits to Indiana, as well as its "dial in" Indiana presence via computer modem are contacts substantial enough to establish specific jurisdiction. Target, on the other hand, argues that its few contacts with Indiana did not pertain to the specifics of the contract breach alleged by M & S (namely, the refusal to pay commission fees), and therefore these contacts are not relevant to the minimum contacts inquiry. Target also contends that it is not subject to jurisdiction in Indiana merely because M & S's performance of the contract occurred in Indiana. As demonstrated more fully *infra,* Target's argument represents an unduly narrow view of the minimum contacts analysis, and its motion to dismiss must therefore be denied.

### A. TARGET'S PHYSICAL CONTACTS WITH INDIANA

 Prior to discussing Target's contacts with Indiana, it is helpful to recall the basic terms of the asserted contract between M & S and Target. M & S, a company whose only facility is located in Indiana, agreed to purchase, help adapt, and ultimately demonstrate Target's software. In return, Target allegedly agreed to pay M & S a commission on future sales of Distributor 4GL licenses. Thus, it is clear that the four trips to Indiana by Target employees, which Target concedes

were for the purpose of providing computer assistance in the development of the retail module, were directly associated with the performance of the contract. Both the Seventh Circuit and this Court have long recognized that a defendant's visits to the forum state to check on or assist in the performance of a contract demonstrate the requisite purposeful availment of the privilege to conduct business in the forum state, and therefore Target's four visits to Indiana during the course of the performance of the contract are by themselves sufficient to establish specific jurisdiction over Target in Indiana. *See Wisconsin Elec. Mfg. Co.*, 619 F.2d at 677–78 (holding that personal jurisdiction over defendant existed where defendant's only contacts with the plaintiff's facilities in the forum state were a pre-contract negotiation visit and a post-contract performance negotiation visit); *United States Gypsum Co. v. All Tank Sales & Supply Co.*, 977 F.Supp. 1340, 1343 (N.D.Ill.1997) ("All Tank's visit to Illinois during the course of performance is a significant contact with the state."); *Enviroplan*, 900 F.Supp. at 1060–61 (personal jurisdiction established by two visits to Indiana by representatives of the defendant for negotiations relating to performance under the contract); *Hexacomb*, 905 F.Supp. at 562–63 (in a case where the plaintiff's claims arose from the purchase of a certain machine, the defendant's trip to Indiana to check on the progress of the building of that machine "is a manifest indication that [defendant]

purposefully availed itself of the privilege to conduct business in Indiana."); *Reliable Tool & Machine Co., Inc. v. U–Haul Int'l*, 837 F.Supp. 274, 279 (N.D.Ind.1993) ("The most important factor that demonstrates UHI purposefully availed itself of this forum is that UHI sent its representatives into the State of Indiana on two separate occasions to insure the performance of the contract which forms the basis of this litigation."); *Ogden Eng'g Corp. v. St. Louis Ship*, 568 F.Supp. 49, 54 (N.D.Ind.1983) (Kanne, D.J.).[9]

Target attempts to overcome this rather overwhelming authority with several arguments. First, it contends that the fact that the contract's performance occurred in Indiana does not support jurisdiction, because performance in the forum state does not by itself demonstrate the requisite purposeful availment of the privilege of conducting activities in the forum state. *See Nu–Way Sys. of Indianapolis, Inc. v. Belmont Mktg.*, 635 F.2d 617, 620 (7th Cir.1980); *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co., Inc.*, 597 F.2d 596 (7th Cir.1979). Notably, however, in *Belmont* and *Lakeside* the defendants had no other contacts with the forum state aside from performance of the contract. In contradistinction, Target sent its employees to Indiana to assist with and check on the performance of the contract four different times, which, as discussed *supra*, constitute four separate acts wherein Target purposefully availed itself of the privilege of doing business in Indiana. *See*

---

**9.** Target's visits to Indiana were clearly not "random" or "fortuitous"; indeed, the contract specifically provided that Freeman would be available for three days at M & S's facility in Indiana for on site training. (*See* Pl. Compl. Exh. A. ¶ 7.) Thus, Freeman's participation in the performance of the contract, particularly his apparent critical role is the "cutover" process, was a "contemplated future consequence of the Contract" sufficient to establish jurisdiction in Indiana. *Enviroplan*, 900 F.Supp. at 1061 (citing *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185). Moreover, the contract specifically states that M & S was responsible for Freeman's travel and subsistence costs while he visited M & S's facility in Indiana during these training visits.

(*See* Pl. Compl. Exh. A ¶ 7.) Therefore, the contract itself indicates not only that Target contemplated a significant contact with an Indiana business, but also that Target purposefully availed itself, through Freeman, of certain benefits and protections afforded by this state. *See Mid–America Tablewares*, 100 F.3d at 1361 (by coming to the forum state the defendant, though its representative, invoked the benefits and protections of the forum state's law; "at a minimum, [the forum state] provided police and fire protection for [the defendant's representative] during his visit to [the plaintiff's] facilities.") (citing *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1364 (7th Cir.1985)).

*Wisconsin Elec.*, 619 F.2d at 677 ("The two visits by agents of the defendant to Wisconsin are enough, in our opinion, to distinguish this case from *Lakeside.*"); *Reliable Tool*, 837 F.Supp. at 279–80 (discussing *Wisconsin Elec. Mfg. Co.* and *Lakeside*, and distinguishing *Lakeside* on the basis of the defendant's visits to the forum state). Therefore, Target's reliance on *Belmont* is unavailing.

Target also takes great pains to point out that it did not solicit business from M & S, but rather M & S originally approached Target to initiate the business relationship. Furthermore, Target emphasizes that M & S came to Connecticut to negotiate the deal, and that Target never traveled to Indiana prior to executing the contract. According to Target, the fact that M & S solicited its business, and not the other way around, distinguishes this case from those in which the defendant solicited business from the plaintiff in the forum state. When faced with a similar argument, the Seventh Circuit observed that:

> [i]t would seem, then, we face a dilemma similar to one sometimes encountered by parents with small children—which child to believe when both claim the other started the argument. *However, the constitutionality of jurisdiction does not turn on which party "started it."* Rather, pinning down which party initiated the transaction is merely one helpful factor in the jurisdictional equation. . . . For no matter which party got the ball rolling, if [the defendant] eventually served the Wisconsin market, [the defendant] purposefully established sufficient minimum contacts to subject it to personal jurisdiction in Wisconsin.

*Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir.1996) (emphasis added).[10] Thus, while arguably relevant, the fact the M & S originally solicited Target

is not in any way dispositive of the inquiry. Given Target's significant contacts with Indiana in relation to the contract, as discussed *supra*, this fact is simply of no constitutional moment. *See Enviroplan*, 900 F.Supp. at 1061 ("It would be disingenuous for Defendant to claim that it was a mere passive purchaser of services from an out-of-state vendor and that it could not foresee being haled into this forum.").

Target next argues that its contacts with Indiana (i.e., the visits of Freeman and Lincoln to provide computer assistance), are not sufficient to establish personal jurisdiction because they are not "related to" the merits of M & S's breach of contract claim, which alleges a failure to pay commission fees. However, the rule in contract cases is that the minimum contacts are "related to" the lawsuit when those contacts involve the "dealings between the parties in regard to the disputed contract." *RAR, Inc.*, 107 F.3d at 1278 (quoting *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.*, 75 F.3d 147, 153 (3d Cir.1996)); *see also Wisconsin Elec. Mfg. Co. v. Pennant Prods., Inc.*, 619 F.2d 676, 678 (7th Cir. 1980) (to establish personal jurisdiction in a contract case, the defendant's activities must "relate to the formation or performance of the contract"). Here, Target's visits to Indiana were undertaken to provide computer assistance in the development of the retail module, which, as discussed *supra*, amounted to activity by Target in the forum state directed at checking on or assisting in the performance of the now disputed contract. Accordingly, Target's visits must be characterized as "dealings between the parties in regard to the disputed contract," and therefore Target's minimum contacts relate to this lawsuit.[11]

This conclusion is supported by this Court's decision in *Reliable Tool*, where

---

**10.** Wisconsin's long arm statute, like Indiana's, merely codifies the jurisdictional due process requirements. *Logan Prods.*, 103 F.3d at 52.

**11.** This Court's decision in *Charlesworth* is not to the contrary. The plaintiff there was a sales manager who lived in Indiana and worked for a California based employer. *Charlesworth*, 878 F.Supp. at 1199. He brought an ADEA lawsuit in this Court alleg-

we held that visits made during the course of performance of a contract can be significant contacts with the forum state. *Reliable Tool,* 837 F.Supp. at 280 (citing *Wisconsin Elec.,* 619 F.2d at 678). We continued by stating "[t]his Court deems controlling the fact that [defendant] thought the contract was important enough to *make* substantial contacts with the forum state, not *when* the visit was made." *Id.* at 280–82 (citing *Wisconsin Elec.,* 619 F.2d at 678 nn. 7 & 10) (emphasis added). So too here: Target apparently viewed the development of the retail module as so crucial to the performance of the contract that it sent its people to Indiana on four separate occasions to provide M & S computer assistance. It simply makes no difference that Target's visits occurred during the performance of the contract, or that the lawsuit does not arise out of Target's actions during these visits themselves; the controlling fact is that Target's significant contacts related to the parties' dealings with regard to the disputed contract. *RAR, Inc.,* 107 F.3d at 1278; *Wisconsin Elec.,* 619 F.2d at 678 & nn. 7 & 10; *Reliable Tool,* 837 F.Supp. at 280–81.[12] In sum, Target's visits to Indiana represent sufficient physical minimum contacts to establish personal jurisdiction in Indiana.

### B. TARGET'S ELECTRONIC CONNECTIONS WITH INDIANA

M & S also advances a quite modern minimum contacts argument by contending that the modem connection Target established with the M & S facility, which allowed Target to access and revise the Distributor 4GL software during the process of developing the retail module, establishes the requisite minimum contacts with Indiana. Both parties agree that this modem connection allows a programmer physically stationed literally anywhere in the world to "work" on the retail module and/or assist in its incorporation into the Distributor 4GL system at M & S's facility in Indiana, but they disagree on the jurisdictional consequences of this arrangement. M & S argues that the modem connection demonstrates that Target purposefully availed itself of the privilege of doing business in Indiana. Target, on the other hand, argues that the mere existence of the modem connection, without any information as to how often Target actually dialed in to Indiana to do work on the Distributor 4GL software, is irrelevant to the jurisdictional inquiry.

The Supreme Court recognized over a decade ago that:

[j]urisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications

---

ing wrongful termination, and therefore had to demonstrate that his employer's contacts with Indiana related in some way to the start of his employment with the company, or his termination. *Id.* at 1200–01. We observed that while the employer had minimum contacts with Indiana through the business the plaintiff generated in this state, the actual decisions to hire and fire the plaintiff occurred in California, and therefore personal jurisdiction did not exist over the employer in Indiana. *Id.* at 1201. In contradistinction, Target's contacts with Indiana were directly related to the contract upon which M & S has brought this lawsuit, a situation clearly distinguishable from *Charlesworth.*

12. *Accord United States Gypsum Co.,* 977 F.Supp. at 1343 ("The fact that All Tank's visit was subsequent to the execution of the contract does not diminish the significance of its contact.") (citing *Reliable Tool,* 837 F.Supp. at 280–81); *Enviroplan,* 900 F.Supp. at 1061 (there is no distinction between negotiations leading to contract formation and negotiations relating to performance; both can establish jurisdiction in a breach of contract case); *Hexacomb,* 905 F.Supp. at 563 (fact that defendant's visit to Indiana was subsequent to the formation of the contract is irrelevant to the purposeful availment inquiry) (citing *Reliable Tool,* 837 F.Supp. at 280–81).

across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184. Thus, although technology may have dramatically changed the way business is done across state lines, the minimum contacts analysis is essentially the same, in that courts can look to either the level of interactivity of an Internet site or the commercial nature of an information exchange via modem to determine whether personal jurisdiction exists in particular circumstances. *E.g., CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1264 (6th Cir. 1996) ("The real question is whether these [computer] connections with Ohio are "substantial" enough that Patterson should reasonably have anticipated being haled into an Ohio court."); *Resuscitation Techs., Inc. v. Continental Health Care Corp.,* No. IP 9601457–C–M/S, 1997 WL 148567, at *4 (S.D.Ind. March 24, 1997) ("this notion of transacting business over the Internet involves examining the level of interactivity, and the commercial nature of the exchange of information that occurs.") (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997)); *Conseco, Inc. v. Hickerson,* 698 N.E.2d 816, 820 (Ind.Ct.App. 1998).

District courts have recently observed that the limited, but growing, number of cases in this Internet/electronic commerce area can be divided into three categories. *E.g., Weber v. Jolly Hotels,* 977 F.Supp. 327, 333 (D.N.J.1997) (discussing *Zippo* ). One category includes cases in which defendants actively do business over the Internet, and personal jurisdiction is found because defendants "enter into contracts

with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet." *Id.* (quoting *Zippo,* 952 F.Supp. at 1124 (citing *CompuServe,* 89 F.3d at 1257)). The second category involves situations "where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information . . .'" *Id.* (quoting *Zippo,* 952 F.Supp. at 1124 (citing *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328 (E.D.Mo.1996))). The third category involves passive Internet sites that merely provide information or advertisements; these generally does not create jurisdiction because "a finding of personal jurisdiction . . . based on an Internet web site would mean that there would be nationwide (indeed, worldwide) personal jurisdiction over anyone and everyone who establishes an Internet site," a notion that is inconsistent with traditional ideas of personal jurisdiction. *Id.* (quotation omitted); *see also Conseco,* 698 N.E.2d at 820 (mere discussion of plaintiff in defendant's web site was not a minimum contact sufficient to allow Indiana to exercise jurisdiction over the defendant).[13]

The modem connection established by Target places this case in the second *Zippo* category, necessitating a closer examination of the nature of the information exchanged through the modem. Target insists that despite the detailed description of the modem connection and its purpose set out in the Offerle affidavit, M & S has put forth no evidence that Target ever actually employed the modem connection to assist in the performance of the contract. (*See* Offerle aff. ¶¶ 8–11.) However, Target does not deny that it provided M & S with the modem connection, (*id.* ¶ 8), and Offerle does assert that "Target was able to *and did* obtain access to the

---

**13.** The Court recognizes that the modem connection at issue in the instant case differs from the Internet sites discussed in the cases referenced *supra,* but nonetheless finds the

distinctions between active and passive websites in the context of Internet · commerce helpful in assessing the jurisdictional question here.

[Distributor 4GL] code via telephone ..." (*Id.* ¶ 9) (emphasis added). Viewing these facts most favorably to M & S, *Charlesworth,* 878 F.Supp. at 1199, it appears that Target did utilize the modem connection to check on or assist M & S in the performance of the contract (i.e., the development of the retail module). As discussed at length *supra,* these contacts, although accomplished electronically, related to the performance of the contract and thus are sufficient to establish personal jurisdiction over Target in Indiana. *See Resuscitation Techs.,* 1997 WL 148567, at *6 ("Without question, [defendants] reached beyond the boundaries of their own state to do business in Indiana. It is not unreasonable for them to be haled into an Indiana forum.").[14]

The conclusion that Target's physical and electronic contacts with Indiana are sufficient to demonstrate that it purposefully availed itself of the opportunity to do business in Indiana is bolstered by the demonstration site clause of the alleged contract. Pursuant to this clause of the contract, prospective licensees of the Distributor 4GL software system traveled to M & S's facility in Indiana to observe the system actually operating in a real world context. In the Court's view, this is akin to Target establishing a store or showroom in the state of Indiana to show its wares to those businesses that would be interested in its product. Viewed in this way, Target's arrangement for a demonstration site pursuant to the contract demonstrates a clear intent to obtain business in Indiana for its product, and indeed it appears that two Indiana companies have expressed at least an initial interest in licensing Target's product. (*See* McConnell aff. ¶ 17.)

In sum, an examination of the totality of the circumstances in this case reveals the following: Target contracted with M & S for M & S to perform computer work in Indiana; the contract provided for Target to send its employees to Indiana to assist M & S in the performance of the contract, which it did on four different occasions; Target established and utilized a computer connection to M & S's facility in Indiana so that Target could dial in and assist M & S in the performance of the contract; Target contracted for M & S to serve a demonstration site for its software product; and finally, M & S has filed a lawsuit alleging a breach of this alleged contract with Target. Taken together, these contacts are in no way "random," "fortuitous," or "attenuated," and clearly demonstrate that Target purposefully availed itself of the benefit of conducting business in the state of Indiana. *Enviroplan,* 900 F.Supp. at 1060. Accordingly, Target should not have been surprised to be haled into this forum to defend a lawsuit arising from this contract. *Burger King,* 471 U.S. at 462, 105 S.Ct. at 2183.

### 2. *Fair Play and Substantial Justice*

█ Now that the Court has determined that Target has minimum contacts with Indiana, we must ascertain whether the exercise of personal jurisdiction comports with fair play and substantial justice by analyzing the facts of the case in relation to the five factors set forth in *Burger King.* The five factors are: (1) the burden on the defendant of having to litigate in

---

**14.** This conclusion is supported by a California state court decision decided on strikingly similar facts. In *Hall v. LaRonde,* 56 Cal. App.4th 1342, 66 Cal.Rptr.2d 399 (1997), Hall, a California software designer, had developed a software module that could be integrated into a retail software package owned by LaRonde, a New York resident. The two connected through electronic mail, and agreed to a contract whereby Hall would integrate his module into the retail package, and assist in updating the new and existing software. In return, LaRonde agreed to pay Hall a commission for every license sold for the new, integrated retail package. Hall filed a breach of contract suit in California state court, alleging that he had not been paid all the licensing fees due to him. The Court found that "LaRonde's contacts consisted of more than simply purchasing a software module from Hall. LaRonde worked with Hall to integrate the module into LaRonde's software package.... Thus, LaRonde created a 'continuing obligation' between himself and a resident of California that subjected LaRonde to personal jurisdiction in California." *Id.* at 1347, 66 Cal.Rptr.2d at 402 (quoting *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2184).

the forum; (2) the interests of the forum; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interests of the several States in furthering fundamental substantive policies. *Mid–America Tablewares,* 100 F.3d at 1362 (citing *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987)); *Reliable Tool,* 837 F.Supp. at 282 (citing *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2184). Moreover, Target must demonstrate a "compelling case" that forcing it to litigate in Indiana would violate traditional notions of fair play and substantial justice. *Logan,* 103 F.3d at 53 (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184–85).

■ Target is undoubtedly burdened to some degree by having to litigate in Indiana, but does not make a compelling case that this burden somehow violates fair play and substantial justice. Indeed, while Target recites M & S's gross revenues to show that M & S can financially afford to litigate in Connecticut, it provides no like information detailing its own resources to demonstrate that it cannot afford to litigate in Indiana. Thus, Target's self-serving and conclusory argument on this point does not convince the Court that the burden of litigating in Indiana violates its due process rights, particularly since its contract with M & S demonstrates its intent to do business in Indiana. *See Logan,* 103 F.3d at 54 ("After all, 'it usually will not be unfair' to subject a defendant who engages in economic activity in a state to the burdens of litigating in that state.") (quoting *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183).

■ The "interests of the forum" factor raises the question of which state's law will be applied to this case. The contract itself does not contain a forum selection clause. Target predictably argues that Connecticut law applies, which would favor a Connecticut forum, while M & S contends that Indiana law should apply, which would favor an Indiana forum. Of course, "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." *Jean v. Dugan,* 20 F.3d 255, 260 (7th Cir.1994) (quoting *Barron v. Ford Motor Co. of Canada, Ltd.,* 965 F.2d 195, 197 (7th Cir.), *cert. denied,* 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992)); *Hartford Accident & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285, 291 (Ind.Ct.App.1998) (same). Where there is no disagreement between the laws of the two competing states, then the forum should apply the forum law. *Jean,* 20 F.3d at 260 (citation omitted); *Hartford Accident & Indem. Co.,* 690 N.E.2d at 291 (citation omitted). Target concedes that it is unaware of any substantive differences between the contract law of Connecticut and Indiana, *see* Def. Br. in Supp. of Mot. to Dis. at 20 n.6, and the Court's research has revealed none. Therefore, this court shall apply the law of Indiana, the forum state, *Jean,* 20 F.3d at 260; *Hartford Accident & Indem. Co.,* 690 N.E.2d at 291, and consequently the interests of the forum favor disposition in Indiana.[15]

---

15. Even if Indiana's conflict of law rules were applied, the same result would obtain. *See Standard Register Co. v. Cleaver,* 30 F.Supp.2d 1084, 1091–92 (N.D.Ind.1998) (in diversity cases, the choice of law rules of the forum state determine which state's substantive law applies) (citing *Klaxon Co. v. Stentor Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Indiana applies the "most intimate contact" rule, and follows the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971), which considers:

(a) the place of contracting;

(b) the place of negotiation of the contract;
(c) the place of performance;
(d) the location of the subject matter of the contract; and
(e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

*Standard Register Co.,* 30 F.Supp.2d 1084 at 1092(citing *Hartford Accident & Indem. Co.,* 690 N.E.2d at 291). Here, the contract was negotiated primarily in Connecticut, but was signed by McConnell in Indiana. *See Coldwell Banker & Co. v. Karlock,* 686 F.2d 596, 600 (7th Cir.1982) (under Indiana law, a con-

M & S, an Indiana resident, clearly has an interest in obtaining relief for its alleged breach of contract claim in an Indiana forum. *Reliable Tool*, 837 F.Supp. at 282 ("Plaintiff is obviously well served by having the dispute litigated in its home state.") Target argues that this controversy would be most efficiently resolved in Connecticut because a number of potential witnesses and Target's business records are located in Connecticut, but this contention overlooks the fact that M & S's business records and key witnesses are presumably located in Indiana. Thus, Target has not pointed to any compelling reason why Connecticut would be a more efficient forum than Indiana. Finally, it is not apparent that dismissing M & S's complaint would serve any substantive state policy. Indeed, this is a garden variety breach of contract action, and Target itself has acknowledged that there is no difference on the substantive contract law of the two states. In sum, Target has failed to make a compelling case that subjecting it to jurisdiction in Indiana violates traditional notions of fair play and substantial justice, and its motion to dismiss for lack of subject matter jurisdiction will be denied.

### B. Failure to State A Claim

#### 1. Standard of Review

A motion to dismiss challenges the sufficiency of the plaintiff's complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). "When a federal court reviews the sufficiency of a complaint ... its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "A complaint ... should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In determining the propriety of dismissal under Fed. R.Civ.P. 12(b)(6), the court "must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences therefrom in favor of the plaintiff." *Perkins v. Silverstein*, 939 F.2d 463 (7th Cir.1991). *See also Gomez v. Illinois State Bd. of Education*, 811 F.2d 1030, 1032–33 (7th Cir.1987). The purpose of the motion to dismiss is to test the legal sufficiency of the complaint and not to decide the merits. *Triad Assoc., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir.1989). "If it appears beyond doubt that plaintiff can prove any set of facts consistent with the allegations in the complaint which would entitled them to relief, dismissal is inappropriate." *Perkins*, 939 F.2d at 466. Further, the court must "construe pleadings liberally, and mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir.1985). Accordingly, complaints should not be dismissed so long as they put the defendant on notice of the claims. *Kaplan v. Shure Brothers, Inc.*, 153 F.3d 413, 419 (7th Cir.1998).

#### 2. Contract Law Principles

Before addressing the specifics of Target's Rule 12(b)(6) motion, the Court will briefly review some principles relating to the various theories of contract recovery and associated remedies that are arguably implicated in the complaint and the parties' briefs. *See Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 n. 11 (Ind.1991), *cert. de-*

tract is deemed made in the state where the last act necessary to make it a binding agreement occurs) (citing *W.H. Barber Co. v. Hughes*, 223 Ind. 570, 63 N.E.2d 417 (Ind. 1945)). The contract was performed in Indiana (by either M & S employees in Indiana, or by Target employees via modem), the subject matter of the contract (i.e., the software) is presumably located in both Indiana and Connecticut, and the parties are residents of Indiana and Connecticut respectively. Given these facts, the Court would find that Indiana has the most intimate contacts to this dispute. *See Dohm & Nelke v. Wilson Foods Corp.*, 531 N.E.2d 512, 514 (Ind.Ct.App.1988).

*nied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415 (1992) (noting that the distinction between contract and quasi-contract theories of recovery "is the subject of some confusion").

 In Indiana, a contractual relationship may arise between two parties in one of three ways. "First, the terms of the agreement may have been uttered, avowed, or expressed, at the time it was made, in which case an express contract results." *City of Indianapolis v. Twin Lakes Enters., Inc.,* 568 N.E.2d 1073, 1078 (Ind.Ct.App.1991), *reh'g denied, trans. denied.* "Second, circumstances may have arisen, or acts may have been done which, according to the dictates of reason and justice, and the ordinary course of dealing, or the common understanding of men, show a mutual intention to contract, in which case an *implied-in-fact* contract arises." *Id.* (italics added). An implied-in-fact contract is equally as binding as an express contract, and requires proof of the same elements of offer, acceptance, and consideration. The only difference between an express contract and an implied-in-fact contract is the mode of proof; the elements and terms of an express contract are arrived at by words, written or spoken, while the elements and terms of an implied-in-fact contract are determined through the acts and conduct of the parties. *See Dyer Constr. Co., Inc v. Ellas Constr. Co., Inc.,* 153 Ind.App. 304, 287 N.E.2d 262, 264 (1972) (quoting *Retter v. Retter,* 110 Ind.App. 659, 40 N.E.2d 385, 386 (1942)). In practice then, the difference between express and implied-in-fact contracts is merely semantic, and there is no legally significant difference between these first two "types" of contractual relationships. *Id.;* 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 1.19, at p. 55 (rev. ed.1993) ("there is no difference between an express and implied[-in-fact] contract"). In an attempt to simplify the discussion, we shall employ the term "contract in fact" in referring to express or implied-in-fact contacts.

 "Third, there may have been no intention to contract at all, and yet one may have come under a legal duty to another of a character that the law precludes him from asserting that he did not agree to perform it; thus, by function of law a contract results by construction or implication. *Implied-in-law,* or constructive contracts, of this [third] class, are similar to the constructive trusts of equity." *Twin Lakes,* 568 N.E.2d at 1078–79 (italics added). Put another way, contracts implied-in-law are not contracts in the true sense, but are "a legal fiction invented by the common-law courts in order to permit a recovery ... where, in fact, *there is no contract,* but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise." *Sonnenburg,* 573 N.E.2d at 408 (quoting *Clark v. Peoples Sav. & Loan Ass'n,* 221 Ind. 168, 46 N.E.2d 681, 682 (Ind.1943)) (emphasis added); *see also Galloway v. Methodist Hosp., Inc.,* 658 N.E.2d 611, 613–14 (Ind.Ct.App.1996) (quoting *Dyer,* 287 N.E.2d at 264); *Lafary v. Lafary,* 522 N.E.2d 916, 918–19 & n. 3 (Ind.Ct.App.1988). In an effort to avoid confusion, we shall refer to this type of claim as one for "unjust enrichment." *See Sonnenburg,* 573 N.E.2d at 408 (classifying a claim for damages in which there is not a contract as one for unjust enrichment); *see also United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co., Inc.,* 81 F.3d 240, 246–47 (D.C.Cir.1996) (recovery for unjust enrichment is possible in the absence of any contract). In addition to these "contractual" remedies, we recognize that the Indiana Supreme Court has adopted the doctrine of promissory estoppel, which allows plaintiffs to recover damages suffered by detrimental reliance on a promise of the defendant. *See The First Nat'l Bank of Logansport v. Logan Mfg. Co., Inc.,* 577 N.E.2d 949, 954 (Ind.1991).

 At this point the Court will comment on the count of the complaint entitled "Quantum Meruit," which has sparked a

discussion of "unjust enrichment" in the parties' briefs. In Indiana, "Quantum Meruit" traditionally retained a specific legal meaning in a specific legal context; it was a remedy for a breach of contract available to an innocent party to recover the value of services performed under the contract. *Ahuja v. Lynco Ltd. Medical Research*, 675 N.E.2d 704, 709 n. 2 (Ind.Ct.App.1996) (citing *Twin Lakes*, 568 N.E.2d at 1078).[16] *See also Modern Elec.*, 81 F.3d at 246 (quantum meruit theory of recovery rests on a contract);[17] *Paffhausen v. Balano*, 708 A.2d 269, 271 & n. 3 (Me.1998) (quantum meruit recovery must be based upon contract principles). However, Indiana courts have also used the term "Quantum Meruit" synonymously with the terms "quasi-contract," "contract implied-in-law," and "constructive contract" to describe claims where a contract in fact does not exist; that is, courts employ these terms as a legal fiction to classify claims for unjust enrichment. *See Twin Lakes*, 568 N.E.2d at 1078.[18] Not surprisingly, courts have recognized that considerable confusion has arisen from the use of the term quantum meruit to describe both contract in fact cases, and cases in which there is no contract. *Twin Lakes*, 568 N.E.2d at 1078. *See also Paffhausen*, 708 A.2d at 271 n. 3 (noting the "considerable confu-

sion" that has developed between unjust enrichment and quantum meruit); *Commerce Partnership 8098 Ltd. v. Equity Contracting Co., Inc.*, 695 So.2d 383, 386–387 (Fla.Dist.Ct.App.1997) (noting that confusion over the term quantum meruit is understandable, in that Florida courts have used it to describe both contract in fact and unjust enrichment cases) (collecting cases). Indeed, the Maine Supreme Court and the D.C. Circuit have explicitly explained that quantum meruit and unjust enrichment are legally distinct theories of recovery; quantum meruit rests on a breach of a contract in fact, while unjust enrichment does not. *Paffhausen*, 708 A.2d at 271 (citing *Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645 A.2d 1142, 1145 (Me.1994)); *Modern Elec.*, 81 F.3d at 240.

At bottom, then, it would appear that the allegations in M & S's complaint could support three theories of recovery. First, M & S could allege that a contract in fact existed and that Target breached that contract, and seek one of the three remedies outlined in note 16, including quantum meruit. Second, M & S could allege that it conferred a measurable benefit upon Target under circumstances in which Target's retention of that benefit without payment would be unjust, thereby stating an unjust

---

**16.** In Indiana, a claim that a contract existed and was breached entitles the plaintiff to three remedies:

> he may treat the contract as rescinded and recover in quantum meruit as far as he has performed;
>
> he may keep the contract alive for the benefit of both parties, remaining at all times willing and able to perform, and at the end of the time specified for performance, sue to recover under the contract;
>
> or he may treat the breach as putting an end to the contract for all purposes of performance and sue to recover the damages caused by refusing to carry out the contract.

*E.g., Armstrong v. Illinois Bankers Life Ass'n*, 217 Ind. 601, 29 N.E.2d 415, 421 (1940) (citing with approval *Federal Life Ins. Co. v. Maxam*, 70 Ind.App. 266, 117 N.E. 801, 804 (1917)); *Scott–Reitz Ltd. v. Rein Warsaw Assocs.*, 658 N.E.2d 98, 103–04 (Ind.Ct.App. 1995); *Twin Lakes*, 568 N.E.2d at 1080; 6

INDIANA LAW ENCYCLOPEDIA, CONTRACTS § 232, at p. 265–66 (West 1958).

**17.** *Modern Elec.* emphasizes that quantum meruit rests on a contract implied in fact, rather than an express contract. However, as mentioned above, "there is no difference between an express and implied[-in-fact] contract." 1 PERILLO, CORBIN ON CONTRACTS § 1.19, at p. 55.

**18.** *See, e.g., Bayh*, 573 N.E.2d at 408 ("Plaintiff's sole common law claim is unjust enrichment, also referred to as quantum meruit, contract implied-in-law, constructive contract, or quasi-contract."). *Accord Galanis v. Lyons & Truitt*, 698 N.E.2d 368, 370 n. 2 (Ind.Ct.App.1998); *Wright v. Pennamped*, 657 N.E.2d 1223, 1229 (Ind.Ct.App.1995); *Bright v. Kuehl*, 650 N.E.2d 311, 317 n. 7 (Ind.Ct. App.1995); *Timothy F. Kelly and Assocs. v. Illinois Farmers Ins. Co.*, 640 N.E.2d 82, 85–86 (Ind.Ct.App.1994).

enrichment claim. *E.g., Sonnenburg,* 573 N.E.2d at 408. Finally, M & S is entitled to advance a promissory estoppel claim pursuant to the standards established in *Nat'l Bank of Logansport,* 577 N.E.2d at 954, for which it could recover reliance damages. *Id.* at 956. It is almost axiomatic that the federal rules permit M & S to plead all three of these claims alternatively in its complaint. *See* Fed.R.Civ.P. 8(e)(2) (claims need not be consistent).[19] With this admittedly lengthy discourse in mind, we shall now evaluate whether the claims advanced by M & S state claims upon which relief may be granted.

### 3. Breach of Contract

Target argues that M & S's complaint fails to state a claim for breach of contract because it fails to allege that M & S actually performed its obligations under the alleged contract, a position for which there appears to be substantial support. *See, e.g., Redfield v. Continental Casualty Corp.,* 818 F.2d 596, 610 (7th Cir.1987); *Hoopla Sports and Entertainment, Inc. v. Nike, Inc.,* 947 F.Supp. 347, 356 (N.D.Ill. 1996) (To plead a contract claim, a plaintiff must make allegations raising an inference that: "... (2) the plaintiff performed its obligations under the contract ...") (citations omitted); *Puller Mortgage Assocs., Inc. v. Keegan,* 829 F.Supp. 1507, 1518 (S.D.Ind.1993); 5 WRIGHT & MILLER § 1235, at p. 270–71. *See also Strong v. Commercial Carpet Co.,* 163 Ind.App. 145, 322 N.E.2d 387, 391 (Ind.Ct.App.1975) (listing "performance by the complaining party" as an essential element of a contractual action).

However, the Seventh Circuit has repeatedly emphasized that Rule 8(a)(2) does not require a plaintiff to plead the specific elements of a contract claim, but only requires that the complaint put the defendant on notice of that claim. *See Kaplan,* 153 F.3d at 419 (complaint alleging breach of warranty did not need to plead facts showing that the plaintiff satisfied the privity requirement, as long as he put the defendant on notice of the claim); *Lewis v. Local Union No. 100 of the Laborer's Int'l Union of North America, AFL–CIO,* 750 F.2d 1368, 1373 (7th Cir.1984) (complaint that did not explicitly claim a breach of contract could be fairly construed to allege a breach of contract claim); *see also Petri v. Gatlin,* 997 F.Supp. 956, 965 (N.D.Ill. 1997) (plaintiff was not required to specifically allege their own performance when the complaint "unquestionably" provided adequate notice of the nature of the breach of contract action); *Ganton Techs., Inc. v. Quadion Corp.,* 755 F.Supp. 203, 207 (N.D.Ill.1990); *Damian Servs. Corp. v. White,* No. 96 C 8628, 1998 WL 596466, at *4 (N.D.Ill. Sept.3, 1998) (complaint that identified the parties and contracts involved and alleged a breach of certain contracts put the defendant on notice of the claim). *See generally Bennett v.*

---

19. *E.g., Brown v. Mid–American Waste Sys., Inc.,* 924 F.Supp. 92, 95 (S.D.Ind.1996) (observing that in a typical contract case, the claimant often alternatively alleges that (1) a contract exists that was breached, and (2) a contract did not exist, but equity demands that the injured party be compensated); *Atlantic Paper Box Co. v. Whitman's Chocolates,* 844 F.Supp. 1038, 1042–43 (E.D.Pa.1994) (as federal courts allow plaintiffs to pursue alternative theories of recovery on both breach of contract and unjust enrichment, plaintiffs are allowed to pursue alternative theories of breach of contract and promissory estoppel); 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 1235, at p. 274 (2d ed. 1990)("WRIGHT & MILLER") ("since consistency in pleading is not required by the federal rules, a party may claim alternatively on an express contract and on an implied contract."); *id.* § 1283 n.9 (plaintiff may sue under a contract in fact and alternatively for unjust enrichment) (collecting cases). *Cf. Modern Elec.,* 81 F.3d at 247 (after trial for breach of contract and quantum meruit, plaintiff was permitted to amend complaint to include an unjust enrichment claim, which conformed to the evidence presented at trial). Indeed, a plaintiff is entitled to present alternative theories of breach of contract and unjust enrichment to the jury when the evidence supports either theory of recovery, so long as the plaintiff recovers only once for his damages. *Twin Lakes,* 568 N.E.2d at 1082 (citations omitted); *Modern Elec.,* 81 F.3d at 247 (the same evidence often supports a contract claim and an unjust enrichment claim).

*Schmidt,* 153 F.3d 516 (7th Cir.1998) (discussing the high threshold for a Rule 12(b)(6) dismissal).[20]

Even assuming that M & S is required to assert that it performed its obligations under the contract, Rule 8(a)(2) makes it clear that this assertion need not be specific. *Hoopla Sports,* 947 F.Supp. at 356 ("a plaintiff must make an allegation raising an inference" that it performed its contractual obligations). The alleged contract (which was attached to the complaint and therefore becomes a part of the pleading for Rule 12(b)(6) purposes, *Beam v. IPCO Corp.,* 838 F.2d 242, 244 (7th Cir.1988); Fed.R.Civ.P. 10(c)), obliges M & S to (1) purchase a Distributor 4GL license, (2) develop a retail module, and (3) allow its facility to be used as a demonstration site for retail sales prospects of Target. M & S alleges in its complaint that it purchased the required license, "employed programmers and incurred development costs associated with developing and debugging the retail sales module," and that "[i]n further performance of its obligations under the agreement, Plaintiff made its premises available for site demonstrations in order that potential customers of Defendant could see the software in operation." Pl. Compl. ¶¶ 1, 7, 8. These allegations support a hypothetical set of facts in which M & S successfully completed the retail module, which drew potential Target licensees to M & S's facility to observe the completed retail module. This is all that is required to survive a Rule 12(b)(6) motion to dismiss. *Graehling v. Village of Lombard, Ill.,* 58 F.3d 295, 297 (7th Cir.1995) ("A suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim.").

Moreover, even if M & S's complaint does not sufficiently allege total performance of its obligations under the contract, it clearly supports an inference that M & S at least substantially performed under the contract, which is all that is required to maintain a breach of contract claim. *See Employers Ins. of Wausau v. Browner,* 52 F.3d 656, 664 (7th Cir.1995) ("In contract law, substantial compliance with contractual duties is often compliance enough.") (citations omitted); *Puller Mortgage Assocs.,* 829 F.Supp. at 1518 ("A party who acts in good faith and substantially performs all that is required of him by a contract may recover from the other party ... Substantial performance is something less than full strict performance, but only in some nonessential way and is practically as good as strict performance.") (citing *McConnell v. Fulmer,* 230 Ind. 576, 105 N.E.2d 817, 819 (Ind.1952)); *General Discount Corp. v. Weiss Machinery Corp.,* 437 N.E.2d 145, 151 (Ind.Ct. App.1982) ("Contract law has long recognized substantial performance rather than strict performance as being sufficient on many contractual situations."); *Dove v. Rose Acre Farms, Inc.,* 434 N.E.2d 931, 933 (Ind.Ct.App.1982) (discussing the doctrine of substantial performance). *See also* 6 INDIANA LAW ENCYCLOPEDIA, CONTRACTS § 228 (West 1958 & Supp.1998); 17A AMER. JUR. 2D *Contracts* §§ 631–35 (1991 & Supp.1998). *Cf. Anderson v. Indianapolis Indiana AAMCO Dealers Advertising Pool,* 678 N.E.2d 832, 838 (Ind. Ct.App.1997) (citing *Twin Lakes,* 568 N.E.2d at 1080 (party who has partially performed his obligations under contract may treat the contract as rescinded by the other party and recover in quantum meruit as far as it has been performed)). Whether a plaintiff substantially per-

---

**20.** Indeed, a survey of Indiana law indicates that the plaintiff's performance is not an essential element of a contract claim, and therefore need not be alleged in the complaint. *See, e.g., Holloway v. Bob Evans Farms, Inc.,* 695 N.E.2d 991, 995 (Ind.Ct.App.1998) ("the essential elements of any breach of contract claim are the existence of a contract, the

defendant's breach thereof, and damages") (citing *Shumate v. Lycan,* 675 N.E.2d 749, 753 (Ind.Ct.App.1997) (citing *Fowler v. Campbell,* 612 N.E.2d 596, 600 (Ind.Ct.App.1993))). The *Holloway* opinion provides a particularly thorough overview of Indiana's general rules of notice pleading in relation to a contract claim.

formed its contractual duties is ordinarily a question of fact, 17A AMER. JUR. *Contracts* § 635, at p. 645, and therefore the question of whether M & S's completion of at least two of its three obligations under the contract (to purchase the Distributor 4GL license and serve as a demonstration site) qualifies as substantially performing its contractual duties is not one that should be answered through a Rule 12(b)(6) motion to dismiss. Indeed, M & S's allegation that it fully performed its demonstration site obligation also supports a reasonable inference that it substantially performed its obligation to develop the retail module. In sum, the complaint may be fairly construed to allege a breach of contract, and more than sufficiently notifies Target as to why M & S is bringing this suit. Therefore, Target's motion to dismiss the breach of contract claim will be denied.[21]

#### 4. *Quantum Meruit*

■ As discussed at length *supra*, there is a legal distinction between quantum meruit, a breach of contract remedy which requires the existence of a contract in fact, and unjust enrichment, in which no contract exists. *See Ahuja*, 675 N.E.2d at 709 n. 2 (citing *Twin Lakes*, 568 N.E.2d at 1078). However, M & S has blurred this distinction by titling count four of its complaint "Quantum Meruit," while asserting under that count that Target was unjustly enriched by the retention of M & S's services. *See* Pl. Compl. ¶ 14. Although the federal rules permit a party to include alternative claims in a single count, *see* Fed.R.Civ.P. (8)(e)(2), M & S's Quantum Meruit count does not set forth a simple, concise, or direct explanation of its intention to do so. Indeed, it can be reasonably inferred from the parties' briefs that neither Target nor M & S is particularly certain of the theory of recovery being advanced under count four. Simply stated, the Quantum Meruit count fails to state a claim upon which relief may be granted because it is insufficient

to place Target (or the Court) on notice as to whether M & S seeks to advance a quantum meruit remedy for a breach of contract, an unjust enrichment claim for relief, or both, and Target's motion to dismiss will therefore be granted as to this count. However, this dismissal will be without prejudice, and M & S will be granted leave to amend its complaint to properly plead this count.

#### 5. *Reliance Expenses*

■ M & S's last count is entitled "Reliance Expenses," under which M & S asserts that it incurred costs and expenses in justifiable reliance upon Target's promises to remit a percentage of licensing fees to it. *See* Pl. Compl. ¶ 16. In its brief, M & S contends that it can recover reliance expenses either as a remedy for a breach of contract, or in the absence of a contract pursuant to a promissory estoppel theory. In either case, count five merely recites an element of damages, not a cognizable legal claim. However, M & S's brief does mention the theory of promissory estoppel, which raises the possibility that M & S really meant to state a claim for promissory estoppel in count five. *Cf. Atlantic Paper Box Co.*, 844 F.Supp. at 1042–43 (plaintiffs are allowed to pursue alternative theories of breach of contract and promissory estoppel). In short, M & S has argued that count five encapsulates either one of two different types of damages, or possibly states a separate theory of recovery, and even under the liberal pleading requirements these contradictory explanations render count five sufficiently ambiguous that it fails to set forth a simple, concise, or direct statement of a remedy, a legal claim for promissory estoppel, or any other legal theory of recovery. Therefore, Target's motion to dismiss will be granted as to the Reliance Expenses count, but will be without prejudice and M & S will be granted leave to amend its complaint to properly plead this count.

---

21. The parties appear to agree that the viability of the claim for an accounting was linked to the breach of contract claim, and therefore Target's motion to dismiss will also be denied as to the claim for an accounting.

## IV. CONCLUSION

For all the reasons provided, Target's motion to dismiss for lack of personal jurisdiction is DENIED, and Target's motion to dismiss for failure to state a claim is GRANTED in part and DENIED in part. The latter motion is granted as to the Quantum Meruit and Reliance Expenses counts, and denied as to the Breach of Contract and Accounting counts. M & S is hereby granted twenty (20) days from the date of this Memorandum of Decision and Order to replead the dismissed counts.

SO ORDERED.